*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2015 UT 28**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

RACHEL GRAVES and DUSTIN RUSSELL, a married couple,
individually and as Conservators for and on behalf of A.R.,
a minor child,
*Appellees,*

*v.*

NORTH EASTERN SERVICES, INC., a Utah corporation and
NORTH EASTERN SERVICES-LAKESIDE, INC., a Utah corporation,
*Appellants.*

No. 20121012
Filed January 30, 2015

First District, Logan Dep't
The Honorable Thomas L. Willmore
No. 100103106

Attorneys:

D. Rand Henderson, Providence, Shaun L. Peck, Craig Winder,
Salt Lake City, for appellees

Gregory J. Sanders, Patrick C. Burt, Salt Lake City, for appellants

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and JUSTICE PARRISH joined.

ASSOCIATE CHIEF JUSTICE NEHRING authored a dissenting
and concurring opinion, in which JUSTICE DURHAM joined.

JUSTICE LEE, opinion of the Court:

¶1    This is an interlocutory appeal from the denial of a defense motion for summary judgment. Plaintiffs alleged negligence in the hiring, training, and supervision of defendants' employees

resulting in the sexual assault of A.R. (a minor child) by defendants' employee Matthew Cooper. The assault took place in a home occupied by disabled individuals who were living under defendants' care. Defendants moved for summary judgment on the grounds that they owed no duty of care to A.R. and that plaintiffs had failed to establish a standard of care through expert testimony. In a subsequent motion, defendants also asserted that in any event they were entitled to apportion liability to their employee under the comparative fault provisions of Utah Code section 78B-5-818. The district court denied defendants' motions, and we granted their petition for interlocutory appeal.

¶2　We affirm in part and reverse in part. First, we affirm the decision holding that defendants owed a duty to A.R. to exercise reasonable care in the hiring, training, and supervision of their employees. We do so on the basis of a special relationship that we find to have been established under the terms of the *Restatement (Second) of Torts* section 317. Second, we uphold the district court's determination that plaintiffs had no obligation to designate an expert witness to establish a standard of care. Finally, we reverse the district court's decision regarding apportionment, holding that the "fault" to be apportioned under Utah Code section 78B-5-818 is not limited to negligence but extends to intentional torts. On that point, we resolve a question identified in our past cases but never previously commanding a majority. *See Field v. Boyer Co.*, 952 P.2d 1078, 1080 (Utah 1998) (Zimmerman, C.J., plurality opinion).

I

¶3　Defendants North Eastern Services-Lakeside, Inc. and North Eastern Services, Inc. (NES[1]) provide services for individuals with mental and physical disabilities. NES's services are provided under contracts with the State of Utah, monitored by the State Department of Human Services. NES employees provide

---

[1] We follow the parties' convention in their briefs on appeal of referring to the corporate defendants collectively as NES—noting, as do defendants in their brief, that North Eastern Services, Inc. asserts a lack of any connection to the events leading to the assault of A.R. and purports to reserve a separate defense on that basis.

various levels of supervision, depending on the needs of the client as determined by the client's "action plan."

¶4 Some NES homes are in residential neighborhoods. Typically such homes are occupied by three or fewer residents. Some of NES's action plans include goals for residents to interact with children, on the rationale that such interactions may be beneficial to the residents.

¶5 The sexual assault on A.R. occurred in a duplex referred to by NES as "Res 7." The Res 7 duplex was in Logan, in a complex surrounding a central parking lot and play area. According to the record on summary judgment, the main door to Res 7 was often left open during the summer, allowing children to come in or out as they pleased.

¶6 There was also evidence of certain features that may have attracted children to approach and enter Res 7. For one thing, one of the residents of Res 7 was known for having candy on hand in his room. When neighborhood children asked about candy, NES staff would sometimes retrieve it for them from that client's room. Alternatively, he or the staff would sometimes invite the children into Res 7 to find the candy.

¶7 The record also indicated that NES staff had maintained a portable swimming pool outside the open door to Res 7. The principal purpose of the pool was for the benefit of the other resident of Res 7 (a second NES client whose action plan required NES monitoring "at all times" when near children). The second client used the pool to soak his feet. Neighborhood children often used it to play in during the summer.

¶8 The other attraction in Res 7 was a television. According to the record, neighborhood children often entered the residence to watch television or videos with the residents and/or NES staff.

¶9 A.R. was sexually abused by NES employee Cooper on July 18, 2008. On that day A.R. was playing in the common area outside of Res. 7, asked for some candy, and was invited into the residence to watch television with Cooper and one of the residents. Cooper eventually escorted A.R. into the bathroom, where he sexually assaulted her.

¶10 Cooper was under the supervision of NES employee Amber Brady at the time of the assault. Brady testified that she

had a "bad feeling" when she saw Cooper show A.R. where the bathroom was, but proceeded with cleaning and vacuuming instead of intervening. She also indicated that when she went to put the vacuum away she saw Cooper and A.R. exiting the bathroom and "had such an awful feeling" when she noticed that A.R. had a "red face" and appeared to have been crying. At that point Brady asked A.R. what was wrong. A.R. responded inaudibly, and Cooper then answered for her, indicating that she "missed her home and wanted to go home."

¶11 Brady then called her supervisor and ultimately the police. Cooper was arrested and charged with aggravated sexual abuse of a child. He subsequently entered a guilty plea, and is now serving a sentence of fifteen years to life in prison.

¶12 NES's actions in hiring and supervising Cooper were of central concern on summary judgment. The evidence established that Michelle Grajeda was the person responsible for interviewing Cooper and checking his references. Yet although Cooper had been terminated from a recent job in the same field for sexually abusive conduct, Grajeda apparently never asked about his previous employment, indicating that she had never been trained to ask such questions. As for checking references, Grajeda testified that she had no memory of calling Cooper's previous employer(s), but believes that she would have done so per her past practice. Plaintiffs, on the other hand, presented evidence that Cooper's prior employer, Lindon Care, had terminated Cooper for sexually abusive actions against a client, had concluded that Cooper was not qualified to work in the field, and alleged that it had "no record of any phone calls received from any representative of [NES] regarding Mr. Cooper's employment with Lindon Care." As for training, the summary judgment record indicated that Brady had not received training on children in NES homes or on how to keep children safe.

¶13 Plaintiffs Rachel Graves and Dustin Russell, A.R.'s parents, filed this negligence action on her behalf in the First District Court. Initially the complaint asserted claims only against Cooper. Plaintiffs subsequently amended the complaint to add claims against the NES defendants, including claims for negligence in hiring, training, and supervising its employees.

¶14 NES eventually filed a motion for summary judgment. The motion asserted two grounds for dismissal of plaintiffs' claims for negligence: (a) that NES owed no duty to A.R., a guest in the home of NES's clients, in its hiring, training, and supervision of employees; and (b) that plaintiffs had failed to establish a standard of care through expert testimony, thereby leaving the jury to speculate as to what NES was reasonably required to do under the circumstances of the case.

¶15 Soon after the filing of the NES motion, plaintiffs sought voluntary dismissal of their claims against Cooper. NES filed a notice asserting its intention to seek apportionment of comparative fault of Cooper under Utah Code section 78B-5-818.

¶16 The district court denied NES's motion for summary judgment on the negligence claims. It also approved dismissal of Cooper as a defendant and ruled that apportionment as to his intentional conduct was improper under section 78B-5-818 (while approving a jury instruction explaining his role in the case).

¶17 We granted NES's petition for interlocutory appeal. We now review the district court's decisions—on summary judgment, and on issues of law—de novo, affording no deference to its determination of the matters on appeal. *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56.

II

¶18 We affirm the denial of NES's motion for summary judgment, concluding that NES owed a duty to A.R. and that plaintiffs had no obligation to present expert testimony in support of a standard of care. We reverse as to the district court's determination regarding apportionment, however. On this issue, we hold that the text of the apportionment statute broadly authorizing apportionment for any and all "fault"—expressly defined to encompass "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury," UTAH CODE § 78B-5-817, encompasses not just negligence but also intentional acts.

A. Duty

¶19 We recently clarified and extended the paradigm for analyzing questions of duty in tort in our opinion in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228. In that case we reaffirmed the core tort-law distinction between misfeasance (active misconduct) and

nonfeasance (omissions). *Id.* ¶ 7. Specifically, we noted that we all generally have a duty of due care in the performance of our affirmative acts, but that a duty regarding nonfeasance typically inheres only in "special legal relationships." *Id.*; *see also Webb v. Univ. of Utah*, 2005 UT 80, ¶ 10, 125 P.3d 906 ("In almost every instance, an act carries with it a potential duty and resulting legal accountability for that act. By contrast, an omission or failure to act can generally give rise to liability only in the presence of some external circumstance—a special relationship."), *overruled on other grounds in Cope v. Utah Valley State College*, 2014 UT 53, ¶ 27, __ P.3d __.

¶20 Thus, a key threshold question regarding duty is whether the plaintiff's harm is alleged to have been caused by (a) an affirmative act of the defendant or (b) an act of a third party that the defendant failed to prevent. In the former case a tort-law duty is the general rule. But in the latter case the general rule is the contrary. A person generally has "no duty to control the conduct of third persons." *Higgins v. Salt Lake Cnty.*, 855 P.2d 231, 236 (Utah 1993) (citing RESTATEMENT (SECOND) OF TORTS § 315 (1965)). This general rule, of course, is subject to a significant exception—under the above-noted "special relationship" principle. *Id.*; *see also Rollins v. Petersen*, 813 P.2d 1156, 1159 (Utah 1991) (acknowledging the general rule and the special relationship exception).

¶21 In explaining these principles in *Rollins*, we "acknowledge[d] the general applicability in Utah of the 'special relation' analysis described in sections 314 through 320 of the Restatement of Torts." 813 P.2d at 1159. The issue in *Rollins* was whether a secure mental health facility owed a duty to prevent a patient from leaving the facility and causing a car accident. *Id.* at 1158. In declining to find such a duty, we first invoked the standard set forth in section 315 of the second Restatement—that

> [t]here is no duty so to control the conduct of a third person to prevent him [or her] from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Id*. at 1159, n.1 (second alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 315). Next, we noted that the "two exceptions" set forth in section 315 "are given more detailed explanation" in subsequent sections. *Id*. at 1159. Of particular relevance in *Rollins* was section 319, which provides that "'[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." *Id*. (quoting RESTATEMENT (SECOND) OF TORTS § 319).

¶22 Our holding in *Rollins* was to decline to find a special relationship between the mental health facility and the plaintiff's decedent. We based that decision on a limiting construction of section 319—that "the 'others' to whom . . . bodily harm is 'likely' and in favor of whom the duty arises must be reasonably identifiable by the custodian either individually or as members of a distinct group." *Id*. at 1162. And because the plaintiff's decedent was not reasonably identifiable, we held that the "hospital owed no duty." *Id*.

¶23 The parties in this case have staked out contrary positions under the above framework. Because the assault on A.R. was perpetrated by a third party (Cooper), NES frames the case as one involving only its nonfeasance—in not undertaking acts (supervision, training, and employment background checks) to prevent the assault. And because the assault was outside the scope of Cooper's employment, NES insists that it bears no responsibility for the acts of its employee.

¶24 Plaintiffs frame the case quite differently. They first portray NES's responsibility in terms of affirmative acts of misfeasance, noting that NES affirmatively enticed children like A.R. into Res. 7, in a manner leading to the assault. Alternatively, plaintiffs contend that this case does involve a special relationship—arising under the *Restatement (Second) of Torts* section 317. That section of the restatement provides as follows:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317.

¶25 We endorse NES's view of the case on the misfeasance / nonfeasance front, but accept plaintiffs' basis for a special relationship. Thus, we conclude that the essence of plaintiffs' claim is in asserting the unreasonableness of NES's failure to prevent the assault perpetrated by a third party, but we adopt the principle set forth in section 317 of the second restatement and find its standards satisfied here.

### 1. Misfeasance / Nonfeasance

¶26 As plaintiffs have noted, their claims implicate some affirmative acts attributable to NES—in enticing children like A.R. into Res. 7 by keeping the door open, maintaining a portable swimming pool outside, and offering candy and television inside. And those acts are plausibly connected to the assault on A.R. Thus, to the extent plaintiffs are complaining about these affirmative acts, NES would have a duty to perform them in a non-negligent, reasonable manner.

¶27 That is ultimately an inadequate basis for a finding of duty here, however. The crux of plaintiffs' case is not that NES was uncareful in the way it placed the portable swimming pool, or in the manner in which it offered candy or television programming. Instead, plaintiffs' core complaint is with NES's omissions or failures—in *not* performing an employment background check on Cooper, and in *not* providing training and supervision for Brady and Cooper. Those omissions, moreover, were significant in their failure to prevent a tortious act of a third party (Cooper). So a decision upholding a duty by NES to perform its affirmative acts in

a reasonable manner would not get the plaintiffs very far. It would leave room for them to charge negligence in the placement of the swimming pool or in offering candy or television, but not to assert their core claim for negligent hiring, training, and supervision.

¶28 The point is related to one we made recently in *Hill v. Superior Property Management Services, Inc.*, 2013 UT 60, 321 P.3d 1054. In *Hill* the question was whether an entity hired to mow the lawn at an apartment complex owed a duty to apartment residents to prevent the hazard associated with offshoots of tree roots growing hidden in the grass. *Id.* ¶ 1. As one of several grounds for such a duty, plaintiffs in *Hill* asserted that the property management company had voluntarily undertaken the affirmative act of mowing the lawn, and claimed that that undertaking sustained a duty under the *Restatement (Second) of Torts* section 323. *Id.* ¶ 38. We rejected that ground for a duty, noting that plaintiffs had "fail[ed] to connect up any activity that [defendant] voluntarily undertook with an allegation of negligence *in the performance of that activity*." *Id.* ¶ 39. In other words, because "the only *specific* voluntary undertaking" identified by plaintiffs in *Hill* was mowing, and plaintiffs conceded that "the tree shoot hazard could not be remedied by mere mowing," we noted in *Hill* that plaintiffs' real claim was that the injury "could have been *prevented* if [defendant] had chosen to undertake *additional activities*." *Id.* ¶¶ 39–41. And we held that defendant's duty "was limited to the extent of its undertaking," not "a basis for a general obligation to undertake affirmative acts in aid of third parties." *Id.* ¶ 41.

¶29 A similar approach is in order here. NES's affirmative acts are a basis for imposing a duty *in the performance of those acts*, not for a broader duty to undertake additional measures aimed at preventing the sexual assault by a third party. And because plaintiffs' claims seem aimed at NES's failures (as regards training, supervision, and employment background checks), and not its affirmative acts, we must proceed to consider the question whether there is a special relationship here sustaining such a duty.

### 2. Restatement (Second) section 317

¶30 NES questions the basis for any such relationship here by asserting that Cooper's sexual assault on A.R. was outside the scope of his employment. Citing *Birkner v. Salt Lake County*, 771

P.2d 1053, 1056–57 (Utah 1989), NES asserts that an "unprovoked, highly unusual, and quite outrageous" act undertaken for "purely personal motives" is beyond the scope of employment. And on that basis NES insists that it "had no special relationship to A.R. who was harmed by the independent conduct of NES's employee Cooper when he criminally acted outside the scope of his employment."

¶31 NES's argument misses a key distinction between vicarious and direct liability. The scope of employment question concerns a principle of agency law, of relevance to the question of an employer's vicarious liability. But the question presented here is one of direct liability—of whether NES can be liable directly (for its own negligence) for harm to a guest resulting from negligence in hiring, training, or supervision.

¶32 The answer to that question depends on whether there is a basis for finding a special relationship sustaining a duty in the circumstances of this case. We find such a basis in the principle set forth in section 317 of the *Restatement (Second) of Torts*. Our caselaw has not previously endorsed this standard directly. But we have cited favorably to the "special relation[ship]" principles in "sections 314 through 320 of the Restatement of Torts." *Rollins*, 813 P.2d at 1159. And we find the standard in section 317 eminently reasonable, while noting that it has been widely endorsed throughout the United States and rarely, if ever, criticized.[2]

---

[2] At least thirty-six state supreme courts have cited § 317 favorably, many explicitly adopting it. *See e.g.*, *Destefano v. Grabrian*, 763 P.2d 275, 287–88 (Colo. 1988) (en banc); *Malicki v. Doe*, 814 So. 2d 347, 361 n.14 (Fla. 2002); *Wong-Leong v. Hawaiian Indep. Refinery, Inc.*, 879 P.2d 538, 549–51 (Haw. 1994); *Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1179–86 (Ill. 2000); *Gariup Const. Co. v. Foster*, 519 N.E.2d 1224, 1228 (Ind. 1988); *Thies v. Cooper*, 753 P.2d 1280, 1285 (Kan. 1988); *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 850 (Ky. 2005); *Fortin v. Roman Catholic Bishop of Portland*, 871 A.2d 1208, 1222 (Me. 2005); *Barclay v. Briscoe*, 47 A.3d 560, 575–76 (Md. 2012); *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 534 (Minn. 1992); *Gibson v. Brewer*, 952 S.W.2d 239, 248 (Mo. 1997) (en banc); *Everitt v. Gen. Elec. Co.*, 979 A.2d 760, 764–65 (N.H. 2009); *Nelson v. Gillette*, 571 N.W.2d 332, 340–41

(Continued)

¶33 Section 317 recognizes a "special relationship" basis for a duty of an employer to exercise reasonable care in preventing an employee from acting outside the scope of employment in "intentionally harming others." RESTATEMENT (SECOND) OF TORTS § 317. NES challenges the wisdom of a duty that it views as fundamentally altering the "employment landscape in Utah," in a manner opening up "liability never before anticipated," turning "theories of scope of employment and respondeat superior . . . on their heads." Specifically, NES questions the prudence of a principle that would render employers insurers against criminal activity perpetrated on their premises, warning that under this standard "every employer who runs a business that ever has children present" would face liability whenever "an employee harms those kids, regardless of how independent or intentional the action is."

¶34 For the most part, NES's opposition is mistaken and misdirected—aimed at a strawman, and not at the section 317 standard that we adopt today. First, as already noted, the duty at stake under section 317 sounds in direct—not vicarious—liability. So the standard we adopt makes no employer an insurer and in no way undercuts the vicarious liability principle of respondeat superior. This is about an employer's duty with respect to its own negligence, not its secondary liability for someone else's.

¶35 Second, the standard in section 317 does not impose liability on "every employer who runs a business that ever has children present." Instead, as quoted above the duty standard we adopt requires proof (a) that the employee who intentionally harms another is on premises he is entitled to enter only by virtue of his status as an employee, and (b) that the employer knows or has reason to know that he has the ability to control the employee

(N.D. 1997); *Vance v. Consol. R. Corp.*, 652 N.E.2d 776, 790 (Ohio 1995); *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 170–71 (Okla. 2008); *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 419–21 (Pa. 1968); *James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330 (S.C. 2008); *Iverson v. NPC Intern., Inc.*, 801 N.W.2d 275, 281 (S.D. 2011); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 313 (Tex. 1983); *Bradley v. H.A. Manosh Corp.*, 601 A.2d 978, 981 (Vt. 1991); *Niece v. Elmview Grp. Home*, 929 P.2d 420, 427 (Wash. 1997) (en banc); *Shafer v. TNT Well Serv. Inc.*, 285 P.3d 958, 966 (Wyo. 2012).

and knows or should know of the necessity and opportunity for exercising such control. *Id.* Perhaps this standard would not be satisfied in circumstances where the employer's business does not foreseeably put its workers in contact with the public, since in that case the employer might not know of the necessity and opportunity for exercising control. But this is not such a case. Here it is more than foreseeable that NES's workers will come into contact with the public, including children like A.R. As noted above, NES affirmatively went out of its way to encourage the involvement of neighbors in the goings-on in Res. 7. It is hardly in a position to question the basis for its knowledge of the necessity of controlling its employees in their interactions with the public.

¶36 Thus, we hereby adopt the standard set forth in section 317 of the second Restatement. And because its elements are satisfied under the undisputed facts of this case, we affirm the district court's decision denying NES's motion for summary judgment on the question of duty.

### B. Standard of Care

¶37 The standard of care in a negligence action is generally a question of fact for the jury. The jury's determination, moreover, is a matter for the commonsense assessment of a lay juror—not for expert testimony. This follows logically from the premise of the standard of care in tort. Because the essential question is the care that a reasonable person would undertake in the defendant's circumstances, we generally leave it to jurors—as ordinary persons representing a particular community—to make that judgment. *See Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶¶ 25–26, 179 P.3d 760.

¶38 Our cases recognize a limited exception to this general rule. In medical malpractice cases, we have generally required expert testimony regarding the standard of care. *See Bowman v. Kalm*, 2008 UT 9, ¶ 7, 179 P.3d 754. The rationale is rooted in an intuitive exception to the above-noted rule—that unlike the run-of-the-mill negligence case, "most medical malpractice cases 'depend upon knowledge of the scientific effect of medicine,'" a matter "not within the common knowledge of the lay juror." *Id.* (quoting *Fredrickson v. Maw*, 227 P.2d 772, 773 (Utah 1951)).

¶39 The medical malpractice exception itself is subject to a further exception. Under the "common knowledge" exception, expert testimony is not required—and the matter is left up to the

jury's lay assessment—in cases where the standard of care could be assessed according to lay common knowledge. *Id.* ¶¶ 9–10. Thus, where a "medical procedure is so common or the outcome so affronts our notions of medical propriety" that scientific knowledge is not necessary, "the plaintiff can rely on the common knowledge and understanding of laymen to establish this element." *Nixdorf v. Hicken*, 612 P.2d 348, 353 (Utah 1980).

¶40 Ultimately, then, the question of the need for expert testimony turns on the nature of the standard to be addressed by the jury. Questions of ordinary negligence are properly determined by the lay juror without the need for expert testimony. Where the standard implicates scientific matters beyond the capacity of an ordinary juror, however, expert testimony may be required. *See Jenkins v. Jordan Valley Water Conservancy Dist.*, 2013 UT 59, ¶¶ 11, 16–17, 321 P.3d 1049 (holding that expert testimony was required on the question whether a cast-iron pipeline needed to be replaced, given that analysis of that question was "not within the knowledge and experience of average lay persons," but would depend on esoteric questions "such as soil conditions, burial depth, and the extent of any earth movement in the area").

¶41 We see no basis for requiring expert testimony regarding the standard of care in this case. The question of what a reasonable person would do in performing background checks in hiring and in training and supervising employees is one permissibly resolved on the basis of the knowledge and experience of lay persons. NES has cited no cases, and we are aware of none, requiring expert testimony on such matters.

¶42 The case NES does cite, *Collins v. Utah State Developmental Center*, 1999 UT App 336, 992 P.2d 492, clearly cuts the other way. In *Collins*, the staff of a group home allowed a mentally handicapped woman to use a swing set, resulting in severe injury. *Id.* ¶ 3. The issue in the ensuing litigation concerned the need for expert testimony regarding the reasonable care required of a group home in this circumstance. *See id.* ¶¶ 6–8. The *Collins* court concluded that this case was different from the medical malpractice context, where "the nature of the profession removes the particularities of its practice from the knowledge and understanding of the average citizen." *Id.* ¶ 7 (internal quotation marks omitted). Instead, the court of appeals held that this fell within the *Nixdorf* "common-knowledge" exception, as "a lay juror can readily eval-

uate the alleged negligence by the Center in failing to protect Collins from a swing injury." *Id.* ¶ 8.

¶43 The *Collins* court relied on a case that is even closer to the fact pattern at hand, *Virginia S. v. Salt Lake Care Center*, 741 P.2d 969 (Utah Ct. App. 1987). In that case the court of appeals concluded that "where a mentally and physically incapacitated seventeen-year-old girl was raped while under the care and custody of the defendant nursing home, there are no medical technicalities involved that call for expert testimony to determine whether the nursing home breached its standard of care." *Id.* at 972. This case is parallel to *Collins* and *Virginia S.* The matters at issue appear to us to sound in common sense, not science or other subjects of expertise. We accordingly see no basis for requiring plaintiffs to present expert testimony on the standard of care, and affirm the denial of summary judgment on this question as well.

## C. Allocation of Liability

¶44 Decades ago our legislature abrogated the common law doctrine of contributory negligence. In the 1973 Comparative Negligence Act, the legislature replaced this common law defense with a comparative negligence regime. 1973 Utah Laws 710–12. The 1973 act was subsequently revised and extended by the Liability Reform Act of 1986, which maintained the comparative liability regime while extending its scope. 1986 Utah Laws 470.

¶45 Although the governing statutory regime has been in place for decades, this court has not yet had occasion to make a definitive pronouncement on the question presented by this case—whether our comparative negligence regime provides for allocation of responsibility for intentionally tortious conduct. Various members of the court have opined on the issue in separate opinions. *See Field v. Boyer Co.*, 952 P.2d 1078, 1080 (Utah 1998) (Zimmerman, C.J., plurality opinion) (concluding that "an intentional tort such as battery is an act that proximately causes or contributes to injury or damage," and thus that "the legislature included intentional acts in its comparative fault scheme"); *id.* at 1083 (Stewart, J., concurring in part, dissenting in part, joined by Durham, J.) ("The Legislature never intended such an absurd result."). But we have not as yet resolved the matter, as the *Field* case was decided on other grounds, and no majority view was announced on the question before us.

14

¶46 We now interpret our statutory comparative liability regime to call for apportionment of responsibility for intentional torts. That conclusion appears to us to follow from the broad, categorical terms of the Liability Reform Act, as informed by the history and evolution of our statutory scheme. In so holding, we recognize that the statute arguably leaves room for doubt on this question, and of course acknowledge the legislature's prerogative to override our decision or to clarify its intent if we have misperceived it. Thus, we highlight some of the competing policy considerations at stake as we see them, in a manner that may be useful to the legislature if it decides to revisit this important issue.

### 1. Fault

¶47 The apportionment provision of our code calls for the court to "allocate the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person identified under Subsection 78B-5-821(4) for whom there is a factual and legal basis to allocate fault." UTAH CODE § 78B-5-818(4)(a). Matthew Cooper is a person who qualifies for apportionment under the terms of Utah Code section 78B-5-821(4), as NES filed the description of the factual and legal basis for apportionment called for under that section. Thus, the sole question on appeal is whether Cooper is one with a "percentage or proportion of fault attributable" to him.

¶48 That question turns on the statutory definition of "fault." The term is expressly defined in the Liability Reform Act. Under Utah Code section 78B-5-817(2),

> "Fault" means any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all its degrees, comparative negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability, and misuse, modification, or abuse of a product.

¶49 We interpret this definition to encompass intentionally tortious activity. The core definition is broad and categorical. It extends to "any actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages." Thus, the key limiting term of the definition is the element of causation.

*Any* breach of duty, act, or omission counts as fault so long as it is proximately connected to injury or damages.

¶50 The parties' briefs focus on the question whether an intentional tort amounts to a breach of duty. We think that it does, as our caselaw has long defined "duty" in tort to encompass any "obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another," *Jeffs*, 2012 UT 11, ¶ 5 (internal quotation marks omitted), and everyone has a legal obligation to refrain from committing intentional torts.

¶51 That said, the statutory question presented does not require an answer to the "duty" question, as apportionment is called for under the statute not just for breaches of duty but for any *act* or *omission* that proximately causes or contributes to injury or damages. And because there is no tenable notion of "act" that does not extend to an intentional tort, we read the text of our statute to call for apportionment for torts like Matthew Cooper's sexual assault.[3]

---

[3] The dissent takes issue with this conclusion, asserting that the LRA's definition of fault "uses language traditionally associated with negligence" that cannot be read to extend to intentional torts. *Infra* ¶ 79. Specifically, the dissent contends that the words "proximately causing" and "contributing to" injury are "inapt for intentional torts." *Infra* ¶ 79. And although the statute defines "fault" broadly, the dissent insists that the legislature did not intend to enact a "sea change in fault allocation." *Infra* ¶ 80. Instead, the dissent suggests that "fault" was aimed only at avoiding the limitations of the term "negligence," in a manner encompassing "strict liability and products liability" but not intentional torts. *Infra* ¶ 80. We disagree.

First, the foreseeability aspect of proximate causation is frequently relaxed in the case of intentional torts, *see* W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 8, at 37 (5th ed. 1984); *id.* § 43, at 293, but proximate cause is in no way an alien inquiry in the world of intentional torts. *See, e.g.*, *United Food & Commercial Works Unions, Empr's Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1273–74 (11th Cir. 2000) (recognizing "that the requirements of proximate cause are relaxed—to some degree—in intentional tort cases" but concluding that "the usual

(Continued)

¶52 This construction is confirmed by the structure and context of this provision. First, the statutory definition of fault is written in terms encompassing *any* act proximately causing injury. The term *any* is broadening and inclusive. It is defined as "every; all," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (2002), or "one or more without specification or identification." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 96 (2d ed. 1987). That construction of *any* is more than just the ordinary sense of the word as found in the dictionary. It is the sense of the word given in extensive judicial constructions of a broad range of statutory provisions, which consistently recognize the broad, encompassing import of this term.[4] We cannot interpret the statutory

---

common law rule [of proximate cause] still forbids claims like Plaintiff's, even where those claims are premised upon intentional torts"). Second, "fault" is broadly defined by statute to encompass "any . . . act[] or omission." UTAH CODE § 78B-5-817(2). And because there is no way to interpret "any act" in a manner excluding intentional torts, we are bound by the terms of the statute regardless of our vague sense of the legislature's likely intentions. *See infra* ¶¶ 64–68, 74–76.

[4] *See, e.g., Mass. v. E.P.A.*, 549 U.S. 497, 528–29 (2007) ("The Clean Air Act's sweeping definition of 'air pollutant' includes '*any* air pollution agent' . . . . On its face, the definition embraces all airborne compounds of whatever stripe, and underscores that intent through the repeated use of the word 'any.'"); *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (interpreting statutory language reading "any drug-related criminal activity" broadly because "the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind" internal quotation marks omitted)); *Garamendi v. Golden Eagle Ins. Co.*, 25 Cal. Rptr. 3d 642, 646 (Ct. App. 2005) ("[E]ven if silica is not one of the enumerated items listed in the policy definition of pollutants, that listing is not exclusive and silica dust nonetheless comes within the broad definition of 'any solid, liquid, gaseous, or thermal irritant or contaminant.'"); *W. Sur. Co. v. ADCO Credit, Inc.*, 251 P.3d 714, 718 n.7 (Nev. 2011) (broadly interpreting "any breach of a consumer contract"); *In re Ordinance 04-75*, 931 A.2d 595, 603 (N.J.

(Continued)

definition of fault to exclude intentional torts without robbing the term *any* of its clear import. And that, of course, would run counter to our sensible, longstanding canon of preserving meaning for each provision of the statutory text. *State v. Arave*, 2011 UT 84, ¶ 28, 268 P.3d 163 ("It is our duty to give effect, if possible, to every word of [a] statute." (alteration in original) (internal quotation marks omitted)).

¶53 The second point confirming our construction is that the list of actions included within the definition of fault is introduced by the word "including." This renders the absence of any specific reference to intentional torts inconsequential. Like *any*, *including* is an established term of art with an established meaning. BLACK'S LAW DICTIONARY 831 (9th ed. 2009) ("[*I*]*ncluding* typically indicates a partial list."). In statutory cases far and wide, this term is routinely construed as introducing a non-exclusive, exemplary list.[5] And that is of course the obvious, ordinary sense of the word. To *include* is to embody or encompass; *exclude*, of course, is an antonym. RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 967 (defining "include" as "to place in an aggregate,

---

2007) ("Here, based on its statutory context, the word 'any' clearly is synonymous with 'all.'").

[5] *See, e.g.*, *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) ("[U]se of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive."); *People v. W. Air Lines*, 268 P.2d 723, 733 (Cal. 1954) ("The term 'includes' is ordinarily a word of enlargement and not of limitation."); *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 237 P.3d 728, 732–33 (N.M. 2010) ("[U]se of the word 'includes' to connect a general clause to a list of enumerated examples demonstrates a legislative intent to provide an incomplete list of activities."); *State v. Kurtz*, 249 P.3d 1271, 1277 (Or. 2011) ("Typically, statutory terms such as 'including' . . . convey an intent that the accompanying list of examples be read in a non-exclusive sense."); *see also* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 47.7, at 305 (2014) ("'[I]ncludes' is usually a term of enlargement, and not of limitation . . . . It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated." (internal quotation marks omitted)).

class, category, or the like" and listing "exclude" as an antonym); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1143 (defining include as "to place, list, or rate as part or component of a whole or of a larger group, class or aggregate"). So the only way to read the list of examples of acts amounting to *fault* is as a non-exhaustive list.

¶54 A 1994 amendment to the statute omitted an additional phrase—"not limited to." 1994 Utah Laws 1022. Thus, prior to the amendment the statutory definition of fault introduced the listed examples with the phrase "including but not limited to." *Id.* Perhaps the "not limited to" phrasing made the non-exhaustive nature of the list even clearer. But we see no basis for the conclusion that the omission of "not limited to" somehow indicates that "[c]learly the Legislature intended to limit comparative fault principles to the types of claims and defenses specified in the statute." *Field*, 952 P.2d at 1087 (Stewart, J., concurring in part, dissenting in part). That is hardly clear. The omission of "not limited to" could just as easily indicate a move—quite common in legislative amendments—to omit unnecessary surplusage.[6] And in light of the widely accepted meaning of "including" in this context, that is the way we interpret the 1994 amendment. There are ample—abundantly clear—indications of the non-exhaustive nature of the statutory list of illustrative examples *even without* the "not limited to" phrase. So there is no basis for crediting the 1994 amendment as accomplishing anything more than clearing away surplusage, and that is the way we understand it.[7]

---

[6] *See Rahofy v. Steadman*, 2012 UT 70, ¶ 12 n.12, 289 P.3d 534 ("stylistic changes" in legislative amendments have "no substantive effect on our analysis"); *Yu v. Clayton*, 497 N.E.2d 1278, 1281 (Ill. App. Ct. 1986) ("Where the deleted words are simply surplusage, there is no change in the law . . . .").

[7] For all of the above reasons, we see no "omission[]," *infra* ¶ 81, in the statutory text. Thus, we have no quarrel with the notion that "'omissions in statutory language should be taken note of and given effect.'" *Infra* ¶ 81 (quoting *Biddle v. Wash. Terrace City*, 1999 UT 110, ¶ 14, 993 P.3d 875). But in our view there is no omission, as the LRA by its terms expressly encompasses claims involving intentional torts.

### 2. Counterarguments

¶55 The above analysis forecloses plaintiffs' invocation of the *ejusdem generis* canon of construction. That canon, as plaintiffs note, provides that an ambiguity regarding a general term following or followed by an "inexhaustive enumeration of particular or specific terms" may be resolved by interpreting the general term to be "restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent." *State ex rel. A.T.*, 2001 UT 82, ¶ 12, 34 P.3d 228. But the canon comes into play only in cases of ambiguity as to the meaning or scope of the general term. *Great Salt Lake Auth. v. Island Ranching Co.*, 414 P.2d 963, 966 (Utah 1966) ("The rules of statutory construction . . . were developed to aid in determining the intent of legislation where meaning is obscure or uncertain and not to destroy that which is clearly apparent."). Where the general term unambiguously exceeds the scope of a non-exhaustive list, we cannot read the list to override the clear meaning of the general term.

¶56 That conclusion likewise forecloses any significance of the title of section 78B-5-818. *See Field*, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) ("Significantly, the title of [the Act] . . . is 'Comparative negligence.'")). The title makes express reference to "Comparative Negligence." *See* UTAH CODE § 78B-5-818. And it is true that we have, on occasion, afforded some clarifying significance to titles of statutory enactments or provisions. *E.g.*, *Blaisdell v. Dentrix Dental Sys., Inc.*, 2012 UT 37, ¶ 10, 284 P.3d 616. But we have also held that "[t]he title of a statute is not part of the text of a statute, and absent ambiguity, it is generally not used to determine a statute's intent." *Id.* (internal quotation marks omitted); *see also Funk v. Utah State Tax Comm'n*, 839 P.2d 818, 820 (Utah 1992) (declining to interpret a statute to be consistent with its title when the title "is clearly narrower than the plain language of the statute"). So where, as here, the statute's terms are broad and encompassing, extending beyond the title assigned to the provision in question, it is the statute's text that controls, and not its title.

¶57 In this case, moreover, there is a simple explanation—evident in the historical evolution of our statutory scheme—for the section title's reference to comparative *negligence*. The first statutory iteration of our comparative liability regime, the 1973

Comparative Liability Act, dealt exclusively with negligence. It provided that a plaintiff's "[c]ontributory negligence shall not bar recovery" in a negligence action, so long as "such negligence was not as great as the negligence or gross negligence" of the defendant. UTAH CODE § 78-27-37 (1973). It also indicated that the plaintiff's damages were to be "diminished in the proportion to the amount of negligence attributable to" the plaintiff. *Id*. And the court was to "direct the jury to find separate special verdicts determining (1) the total amount of damages suffered and (2) the percentage of negligence of the damages in proportion to the amount of negligence attributable to the person seeking recovery." *Id*. § 78-27-38. That provision is the direct antecedent to the one at issue here. Both provisions are phrased in similar terms—of requiring the court to direct the jury to apportion liability.

¶58 It is hardly surprising, therefore, that the provision at issue here is titled "Comparative Negligence." That was its sole original focus. And even today, that is perhaps its principal application. We cannot from that premise proceed to conclude that the 1986 Liability Reform Act "did not alter the basic principles of comparative negligence contained in the 1973 Act," or that the amended provision "did not . . . include any claims for relief that involved an intent or purpose to harm." *Field*, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part).

¶59 The 1986 amendments most certainly *did* alter the principles of comparative negligence in the 1973 Act. They did so first by abrogating the doctrine of joint and several liability, which had persisted under the 1973 Act. *Compare* 1973 Utah Laws 710 ("The right of contribution shall exist among joint tortfeasors," with "each remaining severally liable to the injured person for the whole injury as at common law."), *with* 1986 Utah Laws 471 ("No defendant is entitled to contribution from any other person."). More significantly, the 1986 amendments replaced the concept of apportionment of comparative "negligence" with the operative principle of apportionment of comparative "fault." *Compare* 1973 Utah Laws 710 ("Contributory negligence shall not bar recovery . . . ."), *with* 1986 Utah Laws 471 ("The fault of a person seeking recover shall not alone bar recovery . . . ."). And of course the 1986 amendments adopted a definition of "fault" that broadly extends beyond mere principles of negligence. It is thus impossible to read

the 1986 Act as merely retaining—and not altering—the basic principles of comparative negligence in the 1973 Act.

¶60 Granted, the 1986 Act "broaden[s] the statute to apply comparative principles in products liability and breach of warranty cases so that defenses such as misuse, abuse of product modification, etc., were no longer absolute bars to recovery but operated only to reduce a plaintiff's recovery." *Field*, 952 P.3d at 1086 (Stewart, J., concurring in part, dissenting in part) (characterizing 1986 Act as "reflect[ing] the abolition of absolute defenses and the adoption of comparative negligence principles" in products liability cases under circumstances like those in *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301 (Utah 1981)). But it would be an oversimplification to read the 1986 amendments as doing no more than that. That conclusion would overlook the impact of the legislative decision to replace a narrow principle of apportionment of comparative "negligence" with a broad concept of apportionment of comparative "fault."

¶61 This court's opinion in the *Mulherin* case puts the 1986 amendments in perspective. That case involved "jury findings of concurrent proximate causes of . . . injury"—of a "defective condition" of a product and of "plaintiff's misuse" of it. 628 P.2d at 1303. Our opinion concluded that the 1973 Act did not apply, as its principles of comparative fault extended only to actions "'to recover damages for negligence or gross negligence,'" and products liability did not technically implicate negligence. *Id.* (quoting UTAH CODE § 78-27-37 (1973)). At the same time, the *Mulherin* court nonetheless adopted a common law rule under which "both faults should be considered by the trier of fact in determining the relative burden each should bear for the injury they have caused." *Id.* (adopting rule under which plaintiff's recovery is limited to "that portion of his damages equal to the percentage of the cause contributed by the product defect"(internal quotation marks omitted)). And in so holding, our court emphasized that the term "fault" in play was "not synonymous with 'negligence,' but instead connote[d] responsibility." *Id.* at 1303 n.7 (citing John W. Wade, *Products Liability and Plaintiff's Fault — The Uniform Comparative Fault Act*, 29 MERCER L. REV. 373, 376 (1978) (arguing that negligence-based fault and strict liability "tend to fade into each other and are not utterly different in kind")). Thus, while acknowledging "semantic difficulties in comparing strict liability and negli-

gence," we indicated our confidence "that judges and juries [would] have no difficulty assigning the relative responsibility each is to bear for particular injury when the ultimate issues in such comparison are relative fault and relative causation." *Id.* at 1304.

¶62 The 1986 Act adopted the essential principles of the *Mulherin* court's analysis. It defined "fault" in a manner that was "not synonymous with 'negligence,' but instead connote[d] responsibility." *Id.* at 1303, n. 7; *see* UTAH CODE § 78B-5-817(2) (defining "fault" as "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury"). And it shifted the focus from apportionment of comparative negligence to the task of "assigning the relative responsibility" based on "relative fault and relative causation." *Id.* at 1304.

¶63 Plaintiffs' construction of the 1986 Act robs the statute's text of its plain meaning. It shifts the focus back to the 1973-era notion of comparative negligence and away from relative fault and causation. We cannot adopt that reading without overriding the clear import of the statutory text.

¶64 Nor can we credit statements in the 1986 Act's legislative history, cited by both the plaintiffs and the dissent, as sustaining the conclusion that our current statute is still merely "'a comparative negligence statute.'" *Field*, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) (quoting Floor Debate S.B. 64, Utah Senate, 46th Leg. 1986, General Sess., Senate Day 31, Records No. 63 (Feb. 12, 1986)); *see also infra* ¶ 83. The statutory text extends well beyond comparative negligence. Such extension, in fact, was the whole point of the 1986 amendments. We cannot properly invoke the legislative history in a manner overriding the terms of the statute. Legislative history is not law. It may be useful in informing our construction of ambiguities in the law. But its utility ends there. *See Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766 (holding that "the statute's language marks its reach," and refusing to allow the legislative history to "supplant" the statutory text).

¶65 The cited legislative history suggests that individual legislators and their counsel may have understood the statutory definition of "fault" as synonymous with "negligence." *See Field*, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part)

(citing statements of Senator Lyle Hillyard and attorney Steve Mecham, both of whom equated "fault" with "negligence"). And perhaps those statements could be accepted as indicating the typical reach of the statute—as explaining that a common application of fault is negligence. But they cannot properly be read to define the full breadth of the statute's scope. That would give primacy to legislative history, and only secondary significance to the duly enacted statute. And it would thereby turn a core principle of statutory construction on its head.

¶66 The dissent chides us for extending fault allocation "to hitherto unknown territory" that it sees as incompatible with the legislature's "purpose." *Infra* ¶ 82. In the dissent's view, "[t]he purpose of the Comparative Negligence Act was to ameliorate the harsh common law rules that made contributory negligence, no matter how slight, an absolute defense to an action by a plaintiff for negligence and barred all recovery." *Infra* ¶ 82 (internal quotation marks omitted). And the dissent would have us limit our understanding of the statute to that purpose, in a manner foreclosing its application to intentional torts.

¶67 We disagree on two grounds. First, as our recent decisions have emphasized, the governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process of bicameralism and presentment.[8] We may resolve ambiguities in the text of the law by refer-

---

[8] *See Schroeder Invs., L.C. v. Edwards*, 2013 UT 25, ¶¶ 24–25, 301 P.3d 994 ("We . . . must implement the particular balance of policies reflected in the terms of [the] statute. *Those terms are the law . . . .*" (alteration in original) (emphasis added)); *State v. Clark*, 2011 UT 23, ¶ 17, 251 P.3d 829 ("Any suppositions about what the legislature may have intended cannot properly override what it actually did."); *see also In re Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989) ("It would demean the constitutionally prescribed method of legislating to suppose that its elaborate apparatus for deliberation on, amending, and approving a text is just a way to create some *evidence* about the law, while the *real* source of legal rules is the mental processes of legislators."); Laurence H. Tribe, "Comment," *in* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 65, 65 (1997) ("[I]t is the text's meaning, and

(Continued)

ence to reliable indications of legislative understanding or intent (as in legislative history). But the invocation of extra-statutory *intent* as a matter overriding the statutory *text* gets things backwards. The statutory language is primary; legislative history is of secondary significance.[9]

¶68 Second, the dissent's position is based on an erroneous premise—that statutory provisions are addressed only to the specific problems giving rise to their adoption. Our recent cases again have repudiated this principle. We have explained that "we cannot presume that the legislature meant only to deal with [one] particular problem, as legislative bodies often start with one problem in mind but then reach more broadly in their ultimate enactment." *Hooban*, 2012 UT 40, ¶ 17. And we have therefore emphasized that "we cannot limit the reach of [a statute] to the ill that initially sparked [the legislature's] interest." *Id.*; *see also Myers v. Myers*, 2011 UT 65, ¶¶ 26–28, 266 P.3d 806 (rejecting the contention that because "the legislative debate was addressed mainly to the need to remove a loophole . . . we ought to construe the amendment as aimed at that purpose alone").

### 3. Policy

¶69 Plaintiffs' position, while falling short under the governing text of the statute, is not without some basis in public policy. We acknowledge some sympathy for the notion that extending the principle of comparative fault to intentional torts may threaten to dampen incentives of a defendant who has a duty to undertake due care in preventing acts of intentional misconduct. Thus, in cases involving a duty to supervise or train employees in a manner that would mitigate the possibility of an intentional tort by another, we recognize that it may seem "unfair to allow [a defendant's] liability to a faultless, injured plaintiff to be reduced or

---

not the content of anyone's expectations or intentions, that binds us as law.").

[9] *See T-Mobile USA, Inc. v. Utah State Tax Comm'n*, 2011 UT 28, ¶ 21, 254 P.3d 752 ("If the plain language [of a statute] is unambiguous, we do not look to other interpretive tools."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous. . . .").

even eliminated by the culpability of an intentional wrongdoer." *Field*, 952 P.2d at 1088 (Stewart, J., concurring in part, dissenting in part).

¶70  That said, the scope of our authority in this matter is limited. In the face of a detailed statutory scheme like the Liability Reform Act, our role as policymaker is preempted. We are relegated to the function of agent of the legislature—of interpreting the policy judgment that it reached, and not of imposing our own will through the exercise of our limited judicial power.

¶71  In any event, the policy question presented in this case is more nuanced—and substantially more difficult—than that posed above. First, it is an overstatement to suggest that extending comparative fault to intentional misconduct would "eliminate[]" the incentive for due care in a manner "eviscerat[ing] defendants' duty to prevent" an intentional wrong. *Id.* It is impossible to argue with the proposition that "[i]ntentional tortious conduct has always been deemed to be categorically different from nonintentional tortious conduct." *Id.* at 1083. But that does not render "absurd[]" any attempt to apportion relative fault. *See id.* at 1088 ("Comparing a defendant's negligence and a rapist's intentional tort results in an absurdity; it is a comparison of unlikes, of apples and oranges."). In a case like this one—where NES allegedly failed to avail itself of numerous opportunities for a clear chance of preventing a sexual assault by an employee with an apparent history of such misconduct—a factfinder could easily apportion ample responsibility to the defendant's acts of negligence.[10] A jury

---

[10] On the other hand, it may well be impossible to conceptualize the notion of apportioning liability to the "negligence" of a victim of an intentional tort—in "not taking adequate measures to protect herself from [an] assault." *Field*, 952 P.2d at 1088 (Stewart, J., concurring in part, dissenting in part). But if so, we can expect a jury to reject this notion out of hand (and likewise expect a savvy defendant to avoid making the argument, for fear of inflaming the jury). And in any event, this notion of apportionment may be a true "absurdity"—a construction so far beyond the realm of the conceivable that we could not possibly attribute it to our legislature, in which case we could reject it despite its compatibility with the statutory text. *State ex rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206

(Continued)

might easily—and appropriately—be moved to cast significant blame on a defendant who fails to avail itself of such opportunities. And that prediction is validated in real-world examples.[11]

(holding the absurdity canon is properly invoked where a construction is so absurd that "the legislative body which authored the legislation could not have intended it").

A parallel point can be made in response to the concern that our construction of the statute might lead to its extension to "breach of contract actions and actions for breach of statutory duties since those actions also involve an 'actionable breach of legal duty.'" *Field*, 952 P.2d at 1087 (Stewart, J., concurring in part, dissenting in part). We see no reason to extend our interpretation in a manner leading to this slippery slope. The Liability Reform Act is all about tort law. Perhaps its principle of "fault" could conceivably be read, in the abstract, to tread into other legal fields. But we don't read statutes in the abstract. We read them in context. And given its context we think the better construction would limit its principle of fault to tortious acts or omissions, and not to extent to breaches of duty rooted in contract or statute.

We are not adopting a principle of apportionment that "has no bounds," as the dissent charges. *Infra* ¶ 81. We hold, instead, that the bounds of the apportionment principle in the LRA are dictated by the terms of the statute, and not our speculation as to legislative purpose. *See infra* ¶ 81 (insisting that "[t]he breadth of possible allocation remains cabined by the intent of the legislature").

[11] *See, e.g.*, *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1056 (Ind. 2003) (upholding jury allocation of fault of 80% to bar and 20% to intentional tortfeasor because the jury "may have chosen to allocate a greater proportion of fault to the Pub than to the assailants because the opportunity for the beating would not even have existed had the Pub not failed to restrict [the intentional tortfeasor] from entering its bar or had it taken appropriate action to prevent or stop the attach on its parking lot"); *Hutcherson v. City of Phoenix*, 961 P.2d 449 (Ariz. 1998) (in a wrongful death suit, allocating 25% fault to the intentional murderer and 75% fault to the negligent 911 emergency operator); *Weidenfeller v. Star & Garter*, 2 Cal. Rptr. 2d 14, 15 (Ct. App. 1991) (allocating 20% fault to a bar which failed to protect a patron and 75% to intentional attacker).

¶72 Second, a refusal to apportion liability for intentional torts would raise line-drawing problems of a different sort. Our comparative liability statute plainly calls for apportionment for a range of tortious activity—not just for simple negligence but also for gross negligence and even recklessness. UTAH CODE § 78B-5-817. A decision foreclosing apportionment for intentional acts would thus raise a significant line-drawing concern along this plane—of how to justify apportionment right up to the line of intent but not beyond it.

¶73 The fairness concerns regarding apportionment, in other words, cut two ways. There is a downside in allowing intentionally tortious conduct to cut off (or at least pare back) the incentive for due care in preventing it. But once we have started down the path of apportionment, there is also a downside to apportioning for negligence, gross negligence, and even recklessness but *not* for intentional acts.

¶74 The dissent overlooks these nuances. Instead of acknowledging the policies supporting extension of the Liability Reform Act's apportionment principle to intentional torts, the dissent simply rehearses the above-noted countervailing concerns. *Infra* ¶ 86 (asserting that "allowing allocation of intentional tortfeasors could have the consequence of rendering the duty of reasonable care by others unenforceable"). And after articulating those policies and ignoring those that cut the other way, the dissent proceeds to espouse the "belief" that those concerns must represent the legislature's true "intent." *Infra* ¶ 88. But that is not a matter of interpretation of the law. It is the assertion of a preferred policy position, cloaked in an assurance that such position (deemed reasonable because it is the view of the judge) must also correspond to the intent of the legislature (a body also presumed reasonable).

¶75 That sort of search for legislative intent is perilous, for reasons articulated long ago:

> [I]n many cases, it is difficult to discover the motives, which may have prompted those who drew up the text; but it is also dangerous to construe upon supposed motives, if they are not plainly expressed. Every one is apt to substitute what his motives would have been, or perhaps, unconsciously, to

> fashion the supposed motives according to his own interests and views of the case; and nothing is a more ready means to bend laws, charters, wills, treatises, &c., according to preconceived purposes, than by their construction upon supposed motives. To be brief, unless motives are expressed, it is exceedingly difficult to find them out, except by the text itself; they must form, therefore, in most cases, a subject to be found out by the text, not the ground on which we construe it.

Francis Lieber, Legal and Political Hermeneutics, or Principles of Interpretation and Construction in Law and Politics 127–28 (1839). We reject the dissent's invocation of policy on these grounds. Interpreting the text of the Liability Reform Act as we understand it, we conclude that the statutory principle of apportionment for "fault" extends to cases involving intentional torts.

¶76 In so doing, we need not take sides on the question of which set of policy concerns identified above may ultimately prove more weighty. Because we conclude that our legislature has spoken on this issue, we defer to its judgment and enforce its decision as we understand it. And we do so not based on any abstract notion of purpose or intent but based on the legislature's actual product—the statutory text. We highlight the above concerns, however, because the statutory question before us is difficult, and we deem the matter sufficiently significant that it might merit further attention in the legislature.

––––––––––––

Associate Chief Justice Nehring, dissenting:

¶77 I concur with the majority opinion in Parts I, II.A, and II.B. However, I respectfully dissent as to Part II.C of the majority opinion because I do not believe the legislature intended the Liability Reform Act (LRA) to allow for the allocation of fault for intentional torts.

¶78 When interpreting a statute, "it is axiomatic that this court's primary goal is to give effect to the legislature's intent in

light of the purpose that the statute was meant to achieve."[12]  In so doing, "we begin first by looking to the plain language of the [statute]."[13]  I agree with the majority that the LRA is written in "broad, categorical terms."[14]  The Act allows a party to allocate the "fault" that is attributable to the plaintiff, another defendant, immune persons, or nonparties.[15]  And the statute defines "fault" as "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery."[16]

¶79 While I agree the definition of "fault" is broad, "we do not interpret the plain meaning of a statutory term in isolation. Our task, instead, is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)."[17]  The majority focuses on the term "act," concluding that "act" must logically and unambiguously encompass intentional torts.[18]  Instead, I would evaluate the text "in relation to the statute as a whole[] to determine its meaning,"[19]  and would presume "the legislature

---

[12] *Biddle v. Wash. Terrace City*, 1999 UT 110, ¶ 14, 993 P.2d 875 (internal quotation marks omitted).

[13] *Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶ 30, 104 P.3d 1208.

[14] *Supra* ¶ 46.

[15] UTAH CODE § 78B-5-818(4)(a).

[16] *Id.* § 78B-5-817(2).

[17] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465 (internal quotation marks omitted).

[18] *Supra* ¶¶ 51–52.

[19] *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 40, 116 P.3d 323 (internal quotation marks omitted).

used each word advisedly."[20]   In considering the plain language, it is not surprising that the LRA speaks in broad terms because its purpose was to expand comparative negligence principles beyond what had been done in the 1973 Comparative Negligence Act.[21] Before passage of the LRA, contributory negligence could still act as a complete bar to recovery for suits brought in, for example, strict liability or products liability.[22]  The LRA thus continued the move from the harsh results of contributory negligence to the moderating effects of comparative negligence.[23]  But the harshness of contributory negligence was not a concern in the realm of intentional torts because it had never applied to such conduct.[24]   As

[20] *Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 46, 164 P.3d 384 (internal quotation marks omitted); *see also Carrier*, 2004 UT 98, ¶ 30 ("[W]e should give effect to any omission in the [statutory] language by presuming that the omission is purposeful."); *Biddle*, 1999 UT 110, ¶ 14.

[21] *See Field v. Boyer Co.*, 952 P.2d 1078, 1086 (Utah 1998) (Stewart, J., concurring in part and dissenting in part).

[22] *See Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1303 (Utah 1981) (noting that the earlier 1973 Comparative Negligence Act did not settle the question of whether plaintiff's contributory negligence bars recovery in a products liability suit "since that statute only applies to the defense of contributory negligence in an action 'to recover damages for negligence or gross negligence'").

[23] *See Hale v. Beckstead*, 2005 UT 24, ¶ 19, 116 P.3d 263 ("Under the prior [contributory negligence] approach, a person who bore any portion of fault, no matter how slight, for his own injuries was barred from recovering against the primary tortfeasor."); *see also supra* ¶¶ 59–60 (explaining the expansion of comparative fault under the LRA).

[24] *See* Allan L. Schwartz, Annotation, *Applicability of Comparative Negligence Principles to Intentional Torts*, 18 A.L.R. 5TH 525 (1994) ("Before comparative negligence was widely adopted, it was black–letter law that contributory negligence principles were not a defense to an intentional tort action.  And under comparative negligence, this same defense of nonapplicability to inten-
(Continued)

Dean Prosser explained, "[c]ontributory negligence has never been considered a good defense to an intentional tort such as a battery."[25]  Thus, it seems strange to read a statute designed to cure the evils of contributory negligence to address a situation where contributory negligence never even applied.  Moreover, the LRA's definition of "fault" supports this understanding because it uses language traditionally associated with negligence to define fault:  any act or omission "proximately causing or contributing to" the injury or damages alleged.[26]  This language is inapt for intentional torts.  For example, it would be odd to say that Mr. Cooper "proximately caus[ed]" or "contribut[ed] to" the sexual assault of A.R. when he committed the assault.

¶80  The legislature's use of the word "fault" instead of "negligence" should not be read to indicate a sea change in fault allocation.  When the legislature expanded allocation principles from

---

tional torts carried over and became the general rule, so that there would be no apportionment of damages where an intentional tort was involved.").

[25] W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 67, at 477 (5th ed. 1984).  Rather, in the context of intentional torts, a defendant may raise an affirmative defense—for example, privilege or consent.  *See id.* § 16, at 109 ("The question of 'privilege' as a defense arises almost exclusively in connection with intentional torts. . . . Negligence . . . is a matter of risk and probability of harm; and where the likelihood of injury to the plaintiff is relatively slight, the defendant will necessarily be allowed greater latitude than where the harm is intended, or substantially certain to follow.").

[26] UTAH CODE § 78B-5-817(2).  "Proximate cause" is a legal fiction developed within the doctrine of negligence as a policy decision of when to cut off liability.  *See Dowell Div. of Dow Chem. U.S.A. v. Del-Rio Drilling Programs, Inc.*, 761 P.2d 1380, 1384 (Utah 1988) ("Proximate cause is a legal construct calling for a legal conclusion . . . .  It is common place in the law that an act, omission, or force may be an actual cause, but not a proximate cause." (internal quotation marks omitted)).

traditional negligence to doctrines like strict liability and products liability, it necessarily could not continue to use the word "negligence." This is because "negligence" is a legal term of art which connotes the existence of a duty and a breach of that duty.[27] But strict liability and products liability do not involve any analysis of duty and breach; thus reference to "negligence" in such cases would be inaccurate. The broader term "fault" more aptly encompasses these doctrines.

¶81 The majority reasons that there is "no tenable notion of 'act' that does not extend to an intentional tort."[28] And thus, because "fault" is a broader term than "negligence," its application has no bounds.[29] But a broadening of fault allocation does not require unlimited expansion. The breadth of possible fault allocation remains cabined by the intent of the legislature. Conspicuously absent from the statute is any reference to intentional torts. The definitional section provides an illustrative list establishing that "fault" includes "negligence in all its degrees, comparative negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability, and misuse, modification, or abuse of a product."[30] This absence is also no-

---

[27] *See* BLACK'S LAW DICTIONARY 1133 (9th ed. 2009) (defining "negligence" as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation").

[28] *Supra* ¶ 51.

[29] Curiously, however, the majority is willing to erect a boundary when it comes to application of the LRA to breach of contract claims, reasoning that "limit[ing] [the LRA's] principle of fault to tortious acts or omissions" is a "better construction" even though the language of the statute "could conceivably be read" to apply to contracts. *Supra* ¶ 71 n.10.

[30] UTAH CODE § 78B-5-817(2). I do not quibble with the majority that an illustrative list such as provided in this section is not exhaustive. *See supra* ¶ 53. But that does not mean it cannot inform our understanding of the text. If we are to "presume that the legislature used each word advisedly," *Martinez*, 2007 UT 42, ¶ 46

(Continued)

ticeable throughout the remaining sections of the statute—there is no reference in any of the statutory sections to an intentional act. Rules of statutory construction dictate that "omissions in statutory language should be taken note of and given effect."[31] Contrary to this canon, the majority reads the solitary term "act" to include intentional torts. But intentional torts are nowhere mentioned or alluded to in the statute. I believe that the illustrative list does not demonstrate any intent to expand allocation to intentional tortfeasors, and I would view the omission of intentional torts from the LRA as purposeful.[32]

¶82 Moreover, the statutory development of Utah's liability jurisprudence can inform our understanding of the legislative intent.[33] Prior to 1973, Utah recognized and applied the doctrine of contributory negligence.[34] As noted by the majority, the legislature abrogated the doctrine of contributory negligence in 1973 with the passage of the Comparative Negligence Act.[35] The purpose of the Comparative Negligence Act "was to ameliorate the harsh common law rules that made contributory negligence, no matter how slight, an absolute defense to an action by a plaintiff

---

(internal quotation marks omitted), I would not consider such a list to be "inconsequential," *supra* ¶ 53.

[31] *Biddle*, 1999 UT 110, ¶ 14 (internal quotation marks omitted).

[32] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 ("[W]e presume[] that the expression of one [term] should be interpreted as the exclusion of another." (second and third alterations in original) (internal quotation marks omitted)).

[33] *See supra* ¶ 46 (interpreting the LRA as "informed by the history and evolution of our statutory scheme").

[34] *See Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 907 (Utah 1984) (explaining that the 1973 Comparative Negligence Act sought "to alleviate the harshness of the old common law doctrine").

[35] *Supra* ¶ 44.

for negligence and barred all recovery."[36]  The subsequent LRA amendments of 1986 effected two changes.  The first was the abrogation of joint and several liability.[37]  The second change "broadened the statute to apply comparative principles in products liability and breach of warranty cases so that defenses such as misuse, abuse of product modification, etc., were no longer absolute bars to recovery but operated only to reduce a plaintiff's recovery, as in negligence cases."[38]  However, today, the majority goes much further, extending allocation of fault to hitherto unknown territory.

¶83 In extending allocation of fault to intentional torts, the majority cites our 1981 opinion in *Mulherin v. Ingersoll-Rand Company*.[39] as putting the 1986 amendments "in perspective."[40]  While I agree that *Mulherin* puts the amendments in perspective, I disagree with the majority's reading of the case.  In *Mulherin*, we were asked to decide whether comparative negligence principles applied to actions based in strict products liability and product misuse.[41]  We stated that due to the defective condition of a product manufactured by the defendant and the misuse of that product by the plaintiff, "[b]oth parties [could] therefore be said to be at fault in contributing to plaintiff's injuries."[42]  A footnote to this statement reads, "[*a*]*s used in this context*, the word 'fault' is not synonymous with 'negligence,' but instead connotes responsibility."[43]  The majority cites this footnote, but omits the important qualifier: "[a]s used in this context" — namely, the context of products liabil-

---

[36] *Field*, 952 P.2d at 1085 (Stewart, J., concurring in part, dissenting in part).

[37] *See* UTAH CODE § 78B-5-818(3).

[38] *Field*, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part).

[39] 628 P.2d 1301 (Utah 1981).

[40] *Supra* ¶ 61.

[41] 628 P.2d at 1303.

[42] *Id.*

[43] *Id.* at 1303 n.7 (emphasis added).

ity claims. The majority correctly notes that the 1986 Act adopted the principles espoused in *Mulherin*,[44] because the legislature passed the LRA amendments in response to our decision in that case.[45] However, in so doing, the legislature did not adopt the majority's interpretation of "fault" as encompassing intentional torts. Instead, the legislature simply "broadened the statute" to apply comparative principles to cases involving "assumption of risk, strict liability, breach of express or implied warranty of a product, products liability, and misuse, modification, or abuse of a product."[46] These additions to the statute did incorporate the *Mulherin* opinion, but that decision had nothing to do with intentional torts. The legislative history confirms this: "Senator Lyle Hillyard stated during debate on the Act, 'I understand *the word "fault" and that's negligence or not doing what you're supposed to, and that's a normal negligent recovery*.'"[47] An attorney for the drafter of the bill responded, "This is a comparative negligence statute."[48] Additionally, the full name of the Liability Reform Act is "An Act Relating to the Judicial Code; *Modifying Provisions Relating to Comparative Negligence*; Specifying Duties of Jurors and Judges; Abolishing Joint and Several Liability and Rights of Contribution Among Defendants; and Defining Certain Terms."[49] The "amendment's title is telling."[50] The Act's history, evidenced by the floor debates and the Act's title, indicate that the LRA was not

---

[44] *See supra* ¶ 62.

[45] *See* Floor Debate S.B. 64, Utah Senate, 46th Leg. 1986, Gen. Sess., Senate Day 31, Records No. 63 (Feb. 12, 1986).

[46] UTAH CODE § 78B-5-817(2).

[47] *Field*, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) (quoting Floor Debate S.B. 64, Utah Senate, 46th Leg. 1986, Gen. Sess., Senate Day 31, Records No. 63 (Feb. 12, 1986)).

[48] *Id.*

[49] 1986 Utah Laws 470 (emphasis added).

[50] *Gressman v. State*, 2013 UT 63, ¶ 64, 323 P.3d 998 (Lee, J., dissenting).

intended to encompass intentional torts. Furthermore, the fact that section 78B-5-818 remains titled "Comparative Negligence" further evidences the exclusion of intentional torts from fault allocation under the LRA.[51]

¶84 Furthermore, *Mulherin*'s footnote seven, cited by the majority, provides another indication that intentional torts are not included in the statutory definition of fault. Both *Mulherin*[52] and the majority[53] cite a law review article by Dean John W. Wade entitled *Products Liability and Plaintiff's Fault—The Uniform Comparative Fault Act.*[54] The article explains, and the majority recognizes, that negligence and strict liability "tend to fade into each other and are not utterly different in kind."[55] Indeed, negligence, strict liability, products liability, and misuse, modification, or abuse of a product are not utterly different in kind, because these doctrines have their genesis in a hybrid of negligence tort action, breach of contract, and warranty of quality theories.[56] In contrast, intentional torts and negligence have long been viewed as different in kind.[57] In *Field v. Boyer Co.*, Justice Stewart aptly illustrated the

---

[51] The majority, however, views this heading as a mere historical vestige that is easily dispensed with. *Supra* ¶¶ 56–58.

[52] 628 P.2d at 1303 n.7.

[53] *Supra* ¶ 61.

[54] 29 MERCER L. REV. 373 (1978).

[55] *Supra* ¶ 61 (citing *Mulherin*, 628 P.2d at 1303 n.7).

[56] *See* 1 DAVID G. OWEN & MARY J. DAVIS, OWEN & DAVIS ON PRODUCTS LIABILITY § 1.3 (4th ed. 2014) ("[Products liability law] is a mixture of tort law—negligence, strict liability in tort, and deceit—and of the contract law of sales—mostly warranty."); RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 1 cmt. a (1998) ("In the early 1960s, American courts began to recognize that a commercial seller . . . should be liable in tort for harm caused by the defect regardless of the plaintiff's ability to maintain a traditional negligence or warranty action.").

[57] *See Field*, 952 P.2d at 1083 (Stewart, J., concurring in part, dissenting in part); *see also Veazey v. Elmwood Plantation Assocs.*, 650 So. 2d 712, 719–20 (La. 1994) ("Because we believe that intentional

(Continued)

difficulties inherent in such comparisons: "Comparing a defendant's negligence and a rapist's intentional tort results in an absurdity; it is a comparison of unlikes, of apples and oranges."[58] And the majority agrees: "[i]ntentional tortious conduct has always been deemed to be categorically different from nonintentional tortious conduct."[59]

¶85 In *Cortez v. University Mall Shopping Center*, the federal district court considered whether a defendant shopping mall could apportion fault under the LRA to an unknown assailant who kidnapped the plaintiff from the mall parking lot and assaulted her.[60] The court explained that "[t]he concepts of intentional tort liability and negligent fault do not lend themselves to easy comparison."[61] The court ultimately concluded that the LRA does not allow for the allocation of fault to intentional tortfeasors.[62] The court also noted that in situations where a defendant

torts are of a fundamentally different nature than negligent torts, we find that a true comparison of fault based on an intentional act and fault based on negligence is, in many circumstances, not possible."); *Brandon ex rel. Estate of Brandon v. Cnty. of Richardson*, 624 N.W.2d 604, 620 (Neb. 2001) ("Negligent and intentional torts are different in degree, in kind, and in society's view of the relative culpability of each act."); *Turner v. Jordan*, 957 S.W.2d 815, 823 (Tenn. 1997) ("[N]egligent and intentional torts are different in degree, in kind, and in society's view of the relative culpability of each act.").

[58] 952 P.2d at 1088 (Stewart, J., concurring in part, dissenting in part).

[59] *Supra* ¶ 71 (quoting *Field*, 952 P.2d at 1083 (Stewart, J., concurring in part, dissenting in part)); *see also* 3 DAN B. DOBBS ET AL., THE LAW OF TORTS § 496 (2d ed. 2014) ("Most jurisdictions do not make such comparisons.").

[60] 941 F. Supp. 1096 (D. Utah 1996).

[61] *Id.* at 1099.

[62] *Id.* at 1100. In arriving at its decision, the court also noted the absence of any reference to intentional torts in the statutory

(Continued)

owes a duty to protect the plaintiff from a specific harm, permitting the defendant to shift fault to the assailant perverts that very duty.[63]  I would agree with the courts in *Cortez* and many of our sister states[64] that intentional torts and negligence, strict liability, and products liability claims are different in kind and not easily compared.

¶86 Finally, as the majority recognizes, there are policy reasons that the legislature would not include intentional torts within the scope of the LRA.[65]   Chief among them is the concern that allowing allocation to intentional tortfeasors could have the consequence of rendering the duty of reasonable care by others unen-

---

language and applied the canons of *noscitur a sociis* and *ejusdem generis*. *Id.*

[63] *Id.* at 1099 ("The duty of the defendant is to act against the anticipated criminal wrong of another to prevent the misconduct of the third person.  To require comparison distorts the protections a plaintiff should be able to claim from a defendant's duty to protect." (footnote omitted)).

[64] *See* Thomas A. Eaton, *Who Owes How Much? Developments in Apportionment & Joint & Several Liability Under O.C.G.A. § 51-12-33*, 64 MERCER L. REV. 15, 17 & n.13 (2012) (collecting cases) ("The vast majority of states take the same position: comparative fault is not a defense to an intentional tort."); *see also Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 606 (Kan. 1991) ("[N]egligent tortfeasors should not be allowed to reduce their fault by the intentional fault of another that they had a duty to prevent."); *Brandon*, 624 N.W.2d at 620 ("[I]t would be irrational to allow a party who negligently fails to discharge a duty to protect to reduce its liability because there is an intervening intentional tort when the intervening intentional tort is exactly what the negligent party had a duty to protect against."); *Turner*, 957 S.W.2d at 823 ("Such comparison . . . reduces the negligent person's incentive to comply with the applicable duty of care.").

[65] *Supra* ¶ 69.

forceable.[66]  "[I]t would be patently unfair to allow [defendants'] liability to a faultless, injured plaintiff to be reduced or even eliminated by the culpability of an intentional wrongdoer."[67]  This rule would likely "depriv[e] the faultless plaintiff of an adequate remedy or any remedy at all" and it would "eviscerate defendants' duty to prevent such a wrong."[68]  The majority acknowledges this possibility.[69]  But the majority comforts itself that a jury "could easily" allocate significant responsibility to the unintentional tortfeasor.[70]  I do not share my colleagues' optimism.[71]

---

[66] *See* 3 DOBBS, *supra* note 59, § 493 (recognizing that policy goals could be defeated where joint and several liability is abolished and fault is apportioned between an intentional tortfeasor and a negligent tortfeasor with a duty to protect against that very intentional tort).

[67] *Field*, 952 P.2d at 1088 (Stewart, J., concurring in part, dissenting in part).

[68] *Id.*

[69] *Supra* ¶ 69 (noting that extending comparative fault to intentional torts "may threaten to dampen incentives of a defendant who has a duty to undertake due care in preventing acts of intentional misconduct").

[70] *Supra* ¶ 71.

[71] *See, e.g.*, *Brandon*, 624 N.W.2d at 611 (in wrongful death action, court reduced liability of county and sheriff by allocating 85 percent fault to murderers and 1 percent fault to victim's own negligence).  A number of our sister states are rightly concerned that, in the face of an intentional harm, juries may not allocate significant fault to parties that are merely negligent.  *See, e.g.*, *Veazey*, 650 So. 2d at 719 ("[A]ny rational juror will apportion the lion's share of the fault to the intentional tortfeasor when instructed to compare the fault of a negligent tortfeasor and an intentional tortfeasor . . . ."); *Brandon*, 624 N.W.2d at 620 ("Fact finders are likely to allocate most, if not all, of the damages to the intentional tort-feasor due to the higher degree of social condemnation attached to intentional, as opposed to negligent, torts."); 3 DOBBS, *supra* note 59, § 498 ("The issue is critical because the negligence of

(Continued)

A.C.J. NEHRING, dissenting

¶87 I am also wary of a categorical pronouncement that the LRA applies to all scenarios involving intentional torts, particularly where we have not answered the question of whether the legislature has abolished joint and several liability as to intentional tortfeasors.[72] Commentators have remarked that the extension of fault allocation to intentional torts can implicate different scenarios, including allocation between: (1) an intentional tortfeasor plaintiff and a negligent defendant, (2) a negligent plaintiff and an intentional tortfeasor defendant, and (3) an innocent plaintiff and a negligent defendant and an intentional tortfeasor defendant.[73] Each of these scenarios may implicate different policy considerations.[74] Thus, for example, though the Restatement does apportion tort liability to intentional torts, it also explicitly notes that "[i]ntentional torts present special problems of apportionment."[75] In attempting to address these concerns, the Restatement provides that a defendant who fails to protect another "from the specific risk of an intentional tort is jointly and severally liable for the share of comparative responsibility assigned to the intentional tortfeasor."[76] Such a rule would address the situation presented in the current case and would not leave an innocent plaintiff with the possibility of no recovery. But the LRA says nothing of the

_____

the landlord, no matter how great, will often be perceived as tiny in comparison to the fault of the rapist . . . ."); *see also* Ellen M. Bublick, *Who Is Responsible for Child Sexual Abuse? A View from the Penn State Scandal*, 17 J. GENDER, RACE & JUST. 297, 304–07 (2014) (expressing concern that allowing apportionment of fault to intentional tortfeasors will negatively impact sexual abuse victims).

[72] *See Jedrziewski v. Smith*, 2005 UT 85, ¶¶ 3–23, 128 P.3d 1146.

[73] 3 DOBBS, *supra* note 59, § 496.

[74] *Id.* ("The difference in the various contexts counsels for caution in making a category-wide rule . . . .").

[75] RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIABILITY § 1 cmt. c (2000).

[76] *Id.* § 14; *see also id.* § 12 cmt. a (retaining joint and several liability for intentional tortfeasors, even in jurisdictions that have abolished joint and several liability).

various scenarios that implicate such fault allocation and indeed, as explained above, makes no mention at all of intentional torts.

¶88  I highlight these concerns not to opine on the wisdom of various tort reforms but to support my belief that the majority does not give effect to the legislature's intent.  The majority's decision today marks a stark departure from long-established tort liability jurisprudence in Utah.  Indeed, the majority seems to recognize the significant move it makes.  Despite its confident assertions that the statute is unambiguous,[77] the majority nonetheless admits that "the statute arguably leaves room for doubt on this question,"[78] and notes that "the statutory question before us is difficult" and "might merit further attention in the legislature."[79] Given the language of the statute and the history of our tort liability doctrines, I am not persuaded that the legislature intended the LRA to allow for the allocation of fault to intentional tortfeasors. And I am not comforted by the idea that the legislature may someday give the matter "further attention."[80]  I would therefore deny defendants' attempt to allocate fault to Mr. Cooper for his intentional tort.

——————————

[77] *Supra* ¶¶ 55, 76.

[78] *Supra* ¶ 46.

[79] *Supra* ¶ 76.

[80] *Supra* ¶ 76.