2008 UT 13

**James PEARCE, Plaintiff and Appellant,**

v.

**UTAH ATHLETIC FOUNDATION, dba Utah Winter Sports Park, and Oscar Podar, a foreign individual or company, Defendants and Appellees.**

**No. 20061030.**

Supreme Court of Utah.

Feb. 12, 2008.

---

**8.** *Boyer v. Clark,* 7 Utah 2d 395, 326 P.2d 107, 109 (1958).

**9.** 2008 UT 10, ¶ 15, 179 P.3d 768.

**10.** *Id.*

Fred R. Silvester, Spencer C. Siebers, Salt Lake City, for plaintiff.

Phillip S. Ferguson, Karra J. Porter, Ruth A. Shapiro, Salt Lake City, for defendants.

PARRISH, Justice:

## INTRODUCTION

¶ 1 In 2003, James Pearce suffered a back injury while riding a bobsled at the Utah Winter Sports Park in Park City, Utah. Pearce brought ordinary negligence and gross negligence claims against the Utah Athletic Foundation ("UAF"), which owns and operates the bobsled track. The district court granted summary judgment to UAF on the ordinary negligence claim because Pearce, prior to riding the bobsled, had signed a liability waiver in which he released any negligence claim against UAF. The district court also granted summary judgment to UAF on the gross negligence claim, holding that Pearce had not presented sufficient evidence to show that UAF's conduct rose to the level of gross negligence. Pearce appeals both holdings. We affirm the district court's grant of summary judgment on the ordinary negligence claim but reverse the district court's grant of summary judgment on the gross negligence claim.

## FACTUAL BACKGROUND

¶ 2 UAF oversees the Olympic legacy venues used during the 2002 Winter Olympics, including the Utah Winter Sports Park ("Sports Park") in Park City, Utah. The Sports Park includes a bobsled track, which is owned and operated by UAF. The bobsled track, which was built by the state of Utah for the 2002 Olympics, was completed in 1996, and ownership and operations were

then transferred to the Salt Lake Organizing Committee ("SLOC"). In 1997, the track was opened to the public through the Public Ride Program ("PRP"). UAF took over the ownership and operation of the bobsled track following the 2002 Olympics and continues to offer the PRP. Besides the Park City track, only two other bobsled tracks are located in North America: one in Lake Placid, New York, and the other in Calgary, Alberta, Canada. The Lake Placid and Calgary tracks also operate a PRP.

¶ 3 To be qualified and approved for Olympic use, a bobsled track has to be designed to specific international standards. One design criterion limits the amount of time that a bobsled athlete can be subjected to more than five Gs. The Federation Internationale de Bobsleigh et de Tobogganing ("FIBT") is the international organization which ensures that a bobsled track's design and construction meet the criteria. The FIBT conducts various measurements and tests to ensure that the standards are met. The Park City bobsled track met the FIBT standards and was used in the 2002 Winter Olympics. When UAF took over ownership and operation of the track following the Olympics, it did not do any testing independent of the testing conducted by the FIBT and the other entities involved with the construction, design, engineering, and certification of the track.

¶ 4 The bobsleds used in the PRP are configured for a driver and three passengers. UAF employs professional, World Cup-level bobsled drivers for its PRP. The PRP sleds are modified from competition sleds. One modification is that the PRP sleds allow the driver to control the braking; in competition sleds, the fourth-seat rider controls the braking. Another modification is that the PRP

sleds have handles for the passengers to hold during the bobsled ride.

¶ 5 On February 27, 2003, Pearce went with his son to the Sports Park to ride the bobsled. Pearce was fifty-nine years old at the time. Before riding the bobsled, Pearce signed a release of liability form.[1] According to Pearce, he was not told what the document was, nor was he told that by signing it he was releasing the Sports Park from liability for injuries caused by its own negligence. Pearce understood that it was a release but did not fully understand the extent of the release. Pearce and the other patrons were given an orientation lasting approximately fifteen minutes. During the orientation, the patrons were told that they would experience four Gs during the ride. Pearce, a mechanical engineer by trade, understood what a G was but did not fully understand the effect that four Gs could have on his body.

¶ 6 The Sports Park managers knew that the g-forces were more pronounced for passengers in the fourth seat of the bobsled than for those in the other seats. Pearce, who was assigned to sit in the fourth seat, was instructed to sit back away from his son—who was seated in the third seat—and to lean forward and grab the handles installed in the modified sled. The Sports Park's general manager testified that these instructions were given to fourth-seat riders to minimize their risk of injury, though he admitted that he did not know how such positioning minimized the risk. One of Pearce's expert witnesses, Dr. Paul France, testified by affidavit that the Sports Park's positioning actually increased the risk of spinal injury to fourth-seat riders. Dr. France opined that the risk of spinal injury could have been reduced by having fourth-seat riders sit more upright, push off the handles, and not flex the spine.

1. The critical part of the release in this case—the sentence in paragraph 3 that releases UAF from its own negligence—states in full:
TO THE FULLEST EXTENT PERMITTED BY LAW, I HEREBY RELEASE, WAIVE, COVENANT NOT TO SUE, AND DISCHARGE THE UAF AND ALL OF ITS TRUSTEES, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, VOLUNTEERS, AGENTS AND REPRESENTATIVES (COLLECTIVELY, THE "RELEASEES") FROM ANY AND ALL LIABILITY, CLAIMS, DEMANDS, AND CAUSES OF ACTION WHATSOEVER ARISING OUT OF OR RELATED TO ANY LOSS, DAMAGE, OR INJURY, INCLUDING DEATH, THAT MAY BE SUSTAINED BY ME/MY MINOR CHILD OR LOSS OR DAMAGE TO ANY PROPERTY BELONGING TO ME/MY MINOR CHILD, WHETHER CAUSED BY THE NEGLIGENCE OF RELEASEES OR OTHERWISE, ARISING OUT OF OR RELATED TO MY/MY MINOR CHILD'S USE OF THE SPORTS FACILITIES OR PARTICIPATION IN THE SPORTS.

During Pearce's ride, the g-forces caused the L1 vertebrae of his spine to shatter, propelling a bone fragment toward his spinal column.

## PROCEDURAL HISTORY

¶ 7 Pearce brought suit against UAF in 2004. He originally claimed ordinary negligence but later amended his complaint to include gross negligence. During the course of the litigation, Pearce presented several allegations to support his negligence claims, including (1) the Sports Park did not obtain or review any of SLOC's accident reports for the years of 1997 through 2002; (2) the Sports Park knew that the fourth seat exposed the rider to the greatest risk of injury but did not warn fourth-seat riders of the increased danger or undertake any measures to mitigate the risks of the fourth seat; (3) the Sports Park instructed fourth-seat riders to sit in a position that increased the risk of spinal injury; (4) the Sports Park failed to warn Pearce that three riders had suffered serious spinal injuries—including compression fractures—during the prior three months; (5) the Sports Park knew that riders had suffered back injuries but never attempted to find out how these back injuries were being caused or what could be done to minimize the risk of back injury; (6) the Sports Park never measured the g-forces on the fourth rider and never did any evaluation of the effect of the g-forces on public riders; (7) Sports Park management reviewed injury reports only at the end of the season and were therefore unaware of the reported spinal injuries contained in the injury reports; and (8) the Sports Park did not conduct any of its own testing to determine the inherent dangers of the ride and how to minimize those dangers.

¶ 8 Following some discovery, UAF moved for summary judgment. UAF argued that the liability release protected it from any action for ordinary negligence and that, in view of the undisputed facts of the case, its conduct did not rise to the level of gross negligence. After briefing and oral argument on the motion, the district court issued its ruling and order.

¶ 9 The district court first ruled in favor of UAF on the gross negligence claim, stating that "the court does not believe plaintiff has set forth sufficient evidence of gross negligence" and that "[t]here is no credible evidence of gross negligence as a matter of law." The court held that the Sports Park's conduct would, at most, amount to ordinary negligence.

¶ 10 The court then ruled that Pearce had waived any ordinary negligence claim by signing the liability release. The court held that the release was valid, enforceable, and not against public policy. Thus, the court ultimately granted UAF's motion for summary judgment on Pearce's ordinary negligence claim because he had assumed the risks of the bobsled ride, including any negligent conduct of the Sports Park.

¶ 11 Pearce now appeals the district court's grant of summary judgment on both negligence claims. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## ISSUES AND STANDARD OF REVIEW

¶ 12 There are two issues on appeal in this case: (1) whether the district court correctly held that the release of liability signed by Pearce barred his ordinary negligence claim against UAF, and (2) whether the district court correctly granted summary judgment to UAF on Pearce's gross negligence claim.

¶ 13 " '[S]ummary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122 (quoting *Norman v. Arnold*, 2002 UT 81, ¶ 15, 57 P.3d 997). A district court's decision to grant summary judgment is reviewed for correctness, with no deference afforded to the district court. *Crestwood Cove Apts. Bus. Trust v. Turner*, 2007 UT 48, ¶ 10, 164 P.3d 1247. "When we review a district court's grant of summary judgment, 'we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *Progressive Cas. Ins. Co. v. Ewart*, 2007 UT 52, ¶ 2, 167 P.3d 1011

(quoting *Carrier v. Salt Lake County*, 2004 UT 98, ¶ 3, 104 P.3d 1208).

## ANALYSIS

### I. ORDINARY NEGLIGENCE

■■■ ¶ 14 In two recent cases, we reaffirmed our position with the majority of states that people may contract away their rights to recover in tort for damages caused by the ordinary negligence of others. *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 6, 175 P.3d 560; *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 15, 171 P.3d 442 ("[Utah's] public policy does not foreclose the opportunity of parties to bargain for the waiver of tort claims based on ordinary negligence."). We also reaffirmed our position that preinjury releases are not unlimited in power and can be invalidated in certain circumstances. Three such limitations are relevant to this case: (1) releases that offend public policy are unenforceable, *Rothstein*, 2007 UT 96, ¶ 6, 175 P.3d 560; (2) releases for activities that fit within the public interest exception are unenforceable, *Berry*, 2007 UT 87, ¶ 16, 171 P.3d 442; and (3) releases that are unclear or ambiguous are unenforceable, *Rothstein*, 2007 UT 96, ¶ 6, 175 P.3d 560. We now analyze each of these limitations and conclude that none is applicable here; therefore, the preinjury release is valid and enforceable.

### A. The Preinjury Release Is Not Contrary to Public Policy

■■■ ¶ 15 We have long held that preinjury releases must be compatible with public policy. *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 7, 175 P.3d 560 (citing *Pugmire v. Or. Short Line R.R.*, 33 Utah 27, 92 P. 762 (1907)). In *Hawkins v. Peart*, we relied on public policy gleaned from Utah law in holding that a preinjury release signed by a parent is not enforceable against a minor child. 2001 UT 94, ¶¶ 10–13, 37 P.3d 1062. In *Rothstein*, we relied on the legislature's statement of public policy in Utah's Inherent Risks of Skiing Act to conclude that a ski resort cannot enforce a preinjury release against a skier whose injuries may have resulted from the negligence of the ski resort.

2007 UT 96, ¶ 20, 175 P.3d 560. In the present case, however, Pearce has not presented, nor has this court found, a public policy that would render unenforceable a preinjury release between a public bobsled ride operator and an adult bobsled rider. Thus, we conclude that the preinjury release signed by Pearce is not contrary to public policy.

### B. The Preinjury Release Is Not Invalid Under the Public Interest Exception

■■ ¶ 16 It is a "general principle of common law that those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of contractual duty." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 12, 171 P.3d 442 (internal quotation marks and citations omitted). Thus, a preinjury release that does not violate public policy is valid and enforceable unless it meets the public interest exception. *Id.* (stating that a preinjury release may be invalidated if it "attempts to limit liability for activities in which there is a strong public interest").

■■ ¶ 17 In *Berry*, we adopted the standard set out in *Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963), as "the traits of an activity in which an exculpatory provision may be invalid" under the public interest exception. *Berry*, 2007 UT 87, ¶ 15, 171 P.3d 442. The six *Tunkl* guidelines are:

"[1] [The transaction] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

[5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents."

*Id.* (quoting *Hawkins v. Peart*, 2001 UT 94, ¶ 9 n. 3, 37 P.3d 1062).

¶ 18 In *Berry*, we applied the six *Tunkl* guidelines to a skiercross race and determined that skiercross racing did not meet the public interest exception. *Id.* ¶¶ 17–24. In the present case, we could again apply the guidelines in order to conclude that bobsledding does not meet the public interest exception, but we go one step further. We now join other states in declaring, as a general rule, that recreational activities do not constitute a public interest and that, therefore, preinjury releases for recreational activities cannot be invalidated under the public interest exception.

¶ 19 In California, where the *Tunkl* test was formulated, appellate courts have applied the *Tunkl* factors to a wide variety of recreational activities and have consistently concluded that such activities do not fit within the public interest exception. *See, e.g., Randas v. YMCA of Metro. Los Angeles,* 17 Cal.App.4th 158, 21 Cal.Rptr.2d 245, 247 (1993) (swimming); *Guido v. Koopman,* 1 Cal.App.4th 837, 2 Cal.Rptr.2d 437, 439–40 (1991) (horseback riding); *Madison v. Superior Court,* 203 Cal.App.3d 589, 250 Cal.Rptr. 299, 305–06 (1988) (scuba diving); *Kurashige v. Indian Dunes, Inc.,* 200 Cal.App.3d 606, 246 Cal.Rptr. 310, 313 (1988) (dirt bike racing); *Okura v. U.S. Cycling Fed'n,* 186 Cal. App.3d 1462, 231 Cal.Rptr. 429, 430–32 (1986) (bicycle racing); *Hulsey v. Elsinore Parachute Ctr.,* 168 Cal.App.3d 333, 214 Cal.Rptr. 194, 199–200 (1985) (parachute jumping). When faced with public interest challenges to preinjury releases for recreational activities, California appellate courts no longer need to go through a *Tunkl* analysis; instead, the courts rely on the general rule—established through years of applying the *Tunkl* test— that "[e]xculpatory agreements in the recreational sports context do not implicate the public interest and therefore are not void as against public policy." *Benedek v. PLC Santa Monica, LLC,* 104 Cal.App.4th 1351, 129 Cal.Rptr.2d 197, 202 (2002); *see also Westlye v. Look Sports, Inc.,* 17 Cal.App.4th 1715, 22 Cal.Rptr.2d 781, 791 (1993) ("[R]ecreational sports do not constitute a public interest under *Tunkl.*").

¶ 20 California courts are not alone in refusing to invalidate preinjury releases in recreational activities under the public interest exception. Courts across the country that have applied the public interest exception to preinjury releases, whether under the *Tunkl* factors or under some other test, have consistently held that recreational activities do not implicate public interest concerns and, therefore, that preinjury releases for recreational activities are not invalid under the public interest exception. *See, e.g., Chadwick v. Colt Ross Outfitters, Inc.,* 100 P.3d 465, 467 (Colo.2004) (distinguishing "businesses engaged in recreational activities, which are not practically necessary and with regard to which the provider owes no special duty to the public" from businesses that implicate the public interest under the *Tunkl* factors); *Seigneur v. Nat'l Fitness Inst., Inc.,* 132 Md.App. 271, 752 A.2d 631, 641 (Ct. Spec.App.2000) ("[C]ourts from other jurisdictions almost universally have held that contracts relating to recreational activities do not fall within any of the categories that implicate public interest concerns."); *Schlobohm v. Spa Petite, Inc.,* 326 N.W.2d 920, 925–26 (Minn.1982) ("Courts from other jurisdictions generally have held contracts relating to recreational activities do not fall within any of the categories where the public interest is involved."); *Henderson v. Quest Expeditions, Inc.,* 174 S.W.3d 730, 733 (Tenn. Ct.App.2005) ("[M]any jurisdictions have recognized that ... recreational sporting activities are not activities of an essential nature which would render exculpatory clauses contrary to the public interest."); *Milligan v. Big Valley Corp.,* 754 P.2d 1063, 1066 (Wyo. 1988) ("[C]ontracts relating to recreational activities do not fall within any of the catego-

ries ... where the public interest is involved.").

¶ 21 We now join the majority of courts by adopting the rule that preinjury releases for recreational activities are not invalid under the public interest exception. Thus, we conclude that the preinjury release in this case is not invalid under the public interest exception because bobsledding is a recreational activity.

### C. The Preinjury Release Is Not Ambiguous

¶ 22 Preinjury releases, to be enforceable, must be "communicated in a clear and unequivocal manner." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 15 n. 2, 171 P.3d 442; *see also Hawkins v. Peart*, 2001 UT 94, ¶ 5, 37 P.3d 1062 (stating that preinjury releases "require a clear and unequivocal expression of the intent to indemnify or release").

> To be effective, a release need not achieve perfection; only on Draftsman's Olympus is it feasible to combine the elegance of a trust indenture with the brevity of a stop sign.... It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence.

*Nat'l & Int'l Bhd. of St. Racers, Inc. v. Superior Court*, 215 Cal.App.3d 934, 264 Cal. Rptr. 44, 47 (1989).

¶ 23 Pearce argues that the liability waiver is invalid as ambiguous because the 111–word sentence in paragraph 3 does not clearly and unequivocally inform riders that they are releasing UAF of any injury caused by UAF's ordinary negligence. We disagree. Although the sentence at issue is long and contains some "legalese," it is not unclear or equivocal. *See Freund v. Utah Power & Light Co.*, 793 P.2d 362, 371 (Utah 1990) (holding that a 97–word sentence in a commercial indemnification agreement clearly and unequivocally showed that the licensee agreed to indemnify the licensor from liability that could arise from the licensor's negligence, even though the word "negligence" was not included in the sentence). The sentence conceivably could have been written more concisely or plainly, but that does not render it unclear or ambiguous. The sentence, in clear and unequivocal language, releases UAF from any claim "whether caused by the negligence of [UAF] or otherwise." Although not perfect, the release is sufficiently clear. Thus, we affirm the district court's conclusion that the preinjury release is valid and enforceable because it is not unclear, equivocal, or ambiguous.

### II. GROSS NEGLIGENCE

¶ 24 Gross negligence is "the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 26, 171 P.3d 442 (internal quotation marks and citations omitted). "Gross negligence requires proof of conduct substantially more distant from the appropriate standard of care than does ordinary negligence." *Id.* Summary judgment in negligence cases, including gross negligence cases, is "inappropriate unless the applicable standard of care is fixed by law, and reasonable minds could reach but one conclusion as to the defendant's negligence under the circumstances." *Id.* ¶ 27 (internal quotation marks and citations omitted). When reviewing grants of summary judgment in negligence cases, "we have consistently followed the principle that summary judgment is generally inappropriate to resolve negligence claims and should be employed only in the most clear-cut case." *Id.* (internal quotation marks and citations omitted).

¶ 25 In *Berry*, a competitive skier brought a gross negligence claim against a ski resort for negligently designing and constructing a skiercross course. *Id.* ¶¶ 6–7. The district court granted the ski resort's motion for summary judgment on the gross negligence claim because the plaintiff had "failed to present evidence sufficient to place in dispute the issue of whether [the ski resort] had designed and built the skiercross course with ... gross negligence." *Id.* ¶ 7. We concluded that the district court improperly granted summary judgment because the standard of care for designing and constructing skiercross courses was not "fixed by law,"

768

and "where a standard of care is not 'fixed by law,' the determination of the appropriate standard is a factual issue to be resolved by the finder of fact." *Id.* ¶ 30 (quoting *Wycalis v. Guardian Title of Utah,* 780 P.2d 821, 825 (Utah Ct.App.1989)). Without the applicable standard of care, it was impossible for the district court to determine the degree to which the ski resort's conduct deviated from the standard of care—"the core test in any claim of gross negligence." *Id.* Thus, we held that a district court cannot properly grant a motion for summary judgment regarding a gross negligence claim unless there is "an identified, applicable standard of care to ground the analysis." *Id.*

 ¶ 26 The present case is very similar to *Berry.* Pearce brought a gross negligence claim against UAF, and the district court granted summary judgment for UAF because Pearce had not "set forth sufficient evidence of gross negligence." However, there is no standard of care fixed by law regarding the operation of public bobsled rides upon which the district court could have based its analysis of gross negligence.[2] Indeed, the district court itself noted that the expert witnesses in the case "[did] not opine on the standard of care in such an industry." Without an identified, applicable standard of care, it was error for the district court to rule on summary judgment that, as a matter of law, Pearce could not show gross negligence. We therefore hold that the district court improperly granted summary judgment to UAF on Pearce's gross negligence claim, and we therefore reverse and remand to the district court.

## CONCLUSION

¶ 27 We hold that Pearce's ordinary negligence claim is barred by the preinjury release that he signed because the release is not against public policy, it does not meet the public interest exception, and it is clear, unequivocal, and unambiguous. Thus, we affirm the district court's grant of summary judgment to UAF on Pearce's ordinary negligence claim.

¶ 28 We reach the opposite conclusion, however, with respect to Pearce's gross negligence claim. We hold that the district court erred in granting summary judgment to UAF on Pearce's gross negligence claim without identifying the applicable standard of care. We therefore reverse and remand to the district court for proceedings consistent with this opinion.

¶ 29 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

---

2. In his brief, Pearce stated that a standard of care has been established by Utah law: "the care required of amusement ride operators is the care that reasonably prudent persons would exercise under the circumstances ... commensurate with the dangers and risks created by the ride." *Lamb v. B & B Amusements Corp.,* 869 P.2d 926, 931 (Utah 1994). Besides the question of whether the bobsled ride is an "amusement ride," the problem with this standard is that it simply states the normal "reasonably prudent person" standard that applies in any negligence case; it does not state more specific standards for designing,

constructing, and testing a bobsled run for the public or for operating a public bobsled ride. *See* Restatement (Second) of Torts § 285, cmt. d (stating that the reasonable person standard "is, without more, incapable of application to the facts of a particular case"). In order to determine what a reasonable bobsled ride operator would do, the finder of fact would likely need to hear testimony from expert witnesses before it could determine the operator's deviation from the standard. *See Berry,* 2007 UT 87, ¶ 30, 171 P.3d 442.