**2022 UT 8**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

BRIAN and MARIAH CUNNINGHAM,
*Appellants,*

*v.*

WEBER COUNTY,
*Appellee.*

No. 20210077
Heard: October 13, 2021
Filed February 17, 2022

On Direct Appeal

Second District, Weber County
The Honorable Reuben J. Renstrom
No. 190901356

Attorneys:

Eric S. Olson, Lena Daggs, Salt Lake City, for appellants

Frank D. Mylar, Andrew R. Hopkins, Salt Lake City, for appellees

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS and JUSTICE PETERSEN joined.

JUSTICE HIMONAS authored a concurring opinion.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1 Brian Cunningham was attending a Special Weapons and Tactics training when he was instructed to stand a few feet away from an explosive set on a door latch. The explosive detonated and caused severe injuries to Cunningham's face and neck. Cunningham and his wife, Mariah Cunningham, sued the training's provider, Weber County. The County moved for summary judgment, arguing that Cunningham had waived any negligence claim against the County when he signed a preinjury release and waiver. The County

further argued the Governmental Immunity Act of Utah does not waive the County's immunity for Cunningham's gross negligence claim or Ms. Cunningham's loss of consortium claim. The district court agreed and entered judgment for the County.

¶2 The Cunninghams appeal, contending that the district court erred across the board. We agree. The preinjury release Cunningham signed was neither clear nor unmistakable and is therefore unenforceable. The Governmental Immunity Act of Utah waives immunity for gross negligence claims. It also waives immunity for loss of consortium claims that arise out of an injury for which immunity has been waived. We reverse the district court's grant of summary judgment and remand.

## BACKGROUND

¶3 Cunningham was a Layton City firefighter paid by Layton City to receive Special Weapons and Tactics (SWAT) training.[1] Weber County conducted that training.

¶4 The day students arrived at the SWAT training, the Ogden Metro SWAT trainers evaluated the students' "immediate health."[2] The trainers gave each student a document to sign (Release). Students were informed that they needed to sign the Release before they could attend the training.

¶5 The document stated:

> **Release and Waiver.** I hereby unconditionally and irrevocably release and discharge the Ogden Metro SWATT [sic] Team and all related organizations and entities from any and all claims, demands, damages actions and causes of action arising, whether directly or indirectly, from or in connection with [his] attending or participating in the described SWAT training[.]

Cunningham signed the Release.

---

[1] On an appeal from a motion for summary judgment, we view the facts in the light most favorable to the non-moving party. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

[2] The Ogden Metro SWAT Team is not a separate legal entity but operates pursuant to an interlocal agreement that Weber County administers.

¶6 During the training, the instructors set an explosive on a door latch and had Cunningham stand "a few feet away." When the explosive detonated, a piece of shrapnel hit Cunningham and caused significant injuries to his face and neck.

¶7 The Cunninghams filed suit against Weber County. They alleged that Weber County negligently failed to follow its safety procedures when it placed him so close to the explosive without a bomb shield or blanket. The Cunninghams also alleged that the County was grossly negligent by failing to observe even the slightest care and by showing an indifference to the consequences that could result during the SWAT training. Ms. Cunningham asserted a loss of consortium cause of action.

¶8 The County moved for summary judgment on all the Cunninghams' claims. Among other things, the County argued that Cunningham had released his negligence cause of action against the County when he executed the Release. The County further argued that the Governmental Immunity Act of Utah (GIA) did not waive governmental immunity for the gross negligence and loss of consortium causes of action.

¶9 The district court agreed and granted the County's motion for summary judgment. It held that the Release was enforceable and precluded the negligence claim. It also concluded that the GIA did not waive immunity for the gross negligence and loss of consortium claims. The Cunninghams appeal.

## STANDARD OF REVIEW

¶10 The Cunninghams argue that the district court erroneously concluded that the Release was enforceable, and that it should have instead concluded that: (1) the Release was contrary to the public interest; (2) the Release contravened public policy; and (3) the Release was not the clear and unmistakable waiver that the law requires for preinjury releases. They also assert that the district court misinterpreted the GIA to conclude that the statute did not waive immunity for gross negligence. And that the district court likewise misread the GIA to decide that the act did not waive immunity for loss of consortium claims based on injuries caused by acts for which the GIA waives immunity. These arguments present questions of law that we review for correctness. *dōTERRA Int'l, LLC v. Kruger*, 2021 UT 24, ¶ 17, 491 P.3d 939.

## ANALYSIS

### I. THE DISTRICT COURT ERRED BECAUSE THE RELEASE IS NOT CLEAR AND UNMISTAKABLE

¶11 The district court dismissed the Cunninghams' negligence claim, finding that Cunningham waived any claim he might have against Weber County when he signed the Release. The Cunninghams argue this was error because the Release is unenforceable.[3] We agree.

¶12 Utah law disfavors preinjury releases. We have long viewed preinjury releases with suspicion, concluding that "the law does not look with favor upon one exacting a covenant to relieve himself of the basic duty which the law imposes on everyone: that of using due care for the safety of himself and others." *Union Pac. R.R. Co. v. El Paso Nat. Gas Co.*, 408 P.2d 910, 913 (Utah 1965). Accordingly, "the presumption is against any such intention, and it is not achieved by inference or implication from general language." *Id.* at 914. Instead, a preinjury release must "make [its] intent clear and unmistakable." *Id.*

¶13 We have reasoned that "contracts exempting persons from liability for negligence induce a want of care, for the highest incentive to the exercise of due care rests in a consciousness that a failure in this respect will fix liability to make full compensation for any injury resulting from the cause." *Jankele v. Texas Co.*, 54 P.2d 425, 427 (Utah 1936) (citation omitted). "It has therefore been declared to be good doctrine that no person may contract against his own negligence." *Id.* (citation omitted). Allowing a party to contract against his own negligence "tend[s] to encourage carelessness and would not be salutary either for the person seeking to protect himself or for those whose safety may be hazarded by his conduct." *Howe Rents Corp. v. Worthen*, 420 P.2d 848, 849 (Utah 1966). We have further asserted that parties entering into contracts should be able "to assume that the other intends to conduct himself as a reasonable and prudent person would under whatever circumstances may thereafter arise, which presupposes that he will commit no wrongful act nor be guilty of negligence." *El Paso Nat. Gas Co.*, 408 P.2d at 913.

---

[3] The Cunninghams also assert that the Release violates public policy and is contrary to the public interest. Because we conclude the Release is not clear and unmistakable, we need not reach the Cunninghams' other arguments.

¶14 Although we respect the ability of two parties bargaining at arm's length to agree that one party may waive its ability to sue for injuries arising out of the other's negligence before any injury is suffered, such arrangements are unenforceable unless they are clear and unmistakable about both parties' intentions. *See Jankele*, 54 P.2d at 427; *El Paso Nat. Gas Co.*, 408 P.2d at 914.

¶15 In the context of preinjury releases, we balance a party's ability to enter freely into contracts against the potential harm that can flow from a party relieved of the obligation to act reasonably. To that end, we demand precision in preinjury releases to ensure that a reasonable person reviewing the document would understand that she is changing the default setting and waiving her right, prior to suffering any injury, to recover the damages caused by another party's negligence.

¶16 For this reason, we will not imply that a party intended, prior to suffering an injury, to release another party from the consequences of her negligent act. *See Union Pac. R.R. Co. v. Intermountain Farmers Ass'n*, 568 P.2d 724, 725 (Utah 1977).[4] In *El Paso Natural Gas Co.*, the parties presented us with a contract stating that the defendant would indemnify and hold the railroad harmless

> from and against *any and all liability*, loss, damage, claims,. . .*of whatsoever nature*, . . . growing out of injury or harm to or death of persons whomsoever, or loss or destruction of or damage to property whatsoever, including the pipe line, when such injury, harm, death, loss, destruction or damage, *howsoever caused*, grows out of or arises from the bursting of or leaks in the pipe line, or *in any other way whatsoever is due to or arises because of the existence of the pipe line* or the construction, operation, maintenance, repair, renewal, reconstruction or use of the pipe line or any part thereof, or to the contents therein or therefrom.

408 P.2d at 912. We recognized that the provision employed broad language—presumably in an attempt to allow for broad

---

[4] *See also Jensen's Used Car v. Rice*, 323 P.2d 259, 260-61 (Utah 1958) (holding "it is also elementary and of extreme practical importance that we hold contracting parties to their clear and understandable language deliberately committed to writing and endorsed by them as signatories thereto").

interpretation. *See id.* at 913-14. But the broad language the parties chose did not reveal a clear and unmistakable intent to release each other from their own negligent acts. *Id.* at 914. We concluded that if "it had been the intent of the parties that the defendant should indemnify the plaintiff even against the latter's negligent acts, it would have been easy enough to use that very language and to thus make that intent clear and unmistakable." *Id.* We accordingly found that the release did not require one party to indemnify the other for its negligent acts. *Id.*

¶17 That is not to say that a release must use specific words to make its intent clear and unmistakable. *See Freund v. Utah Power & Light Co.*, 793 P.2d 362, 371–72 (Utah 1990). In *Freund*, the court considered a release between a cable company and a power company. *Id.* at 364. The language of the release indicated that "[e]xcept for intentional wrongdoing or willful negligence on the part of Licensor, or any of its agents or employees, Licensee shall also indemnify[,] protect[,] and save harmless Licensor from and against any and all claims, demands, causes of action, costs, or other liabilities . . . ." *Id.* at 371 (second and third alterations in original) (emphasis removed). Although that release did not specifically state that the licensee was agreeing to indemnify the licensor for claims that might arise out of the licensor's negligence, the specific carveouts for intentional wrongdoing and willful negligence helped transform what might have been mistakable language into a clear and unmistakable expression of an intent to extend the indemnification to negligent acts. *Id.* Accordingly, the court held that the release intended to give the power company "'full and complete' indemnification" for its own negligence. *Id.* at 371–72.

¶18 The United States District Court for the District of Utah has applied the "clear and unmistakable rule" to find several releases unenforceable. For example, in one case, the parties presented the federal court with a preinjury release that a plaintiff was required to sign before he could compete in a cycling race. *Finken v. USA Cycling, Inc.*, No. 1:17-cv-79, 2020 WL 2926661, at *2 (D. Utah June 3, 2020). A racer suffered a severe injury when he turned a corner on the route and ran into a concrete barrier blocking the road. *Id.* at *1–2. The racer sued USA Cycling as well as the independent contractor in charge of the course design. *Id.* at *2.

¶19 Both USA Cycling and the contractor raised the waiver the racer had signed as a defense against the suit. *Id.* at *2. The waiver was broadly worded. *Id.* It noted "that cycling is an inherently dangerous sport" and included dangers such as "collision with

pedestrians, vehicles, other riders, and fixed or moving objects." *Id.* It further noted "the possibility of serious physical and/or mental trauma or injury, or death associated with the event." *Id.* The defendants argued that the plaintiff had agreed to "waive, release, discharge, hold harmless, and promise to indemnify and not to sue" "USA Cycling's Event Directors, Affiliates, Agents, and Officials" for "any and all rights and claims including claims arising from [their] own negligence." *Id.* at *2, *4 (alteration in original). The court held that the release waived claims against USA Cycling. *Id.* at *3. But it did not unambiguously release USA Cycling's independent contractors because it was unclear whether the term "Event Directors" applied to independent contractors. *Id.* at *4. We endorse the federal court's reasoning that if a preinjury release can lead to a disagreement between reasonable minds about who is released, it cannot be considered unmistakable.

¶20 The federal district court has also concluded that a release is not clear and unmistakable when the language supports more than one reasonable meaning. In *Zollman*, a woman was injured while snowmobiling when she collided with another snowmobiler. *Zollman v. Myers*, 797 F. Supp. 923, 924 (D. Utah 1992). The rental agency required all renters to sign a preinjury release as part of the rental agreement. *Id.* The release "enumerate[d] some of the risks involved in snowmobiling, including the failure to follow instructions." *Id.* at 928. It then "state[d] in bold print that the signer [would] not hold [the rental company] liable, even if [it] or its employees act[ed] negligently." *Id.* However, in the second-to-last clause, the release required the signer to agree "to stop and follow instructions if encountering a hazardous situation. Otherwise, the signer agrees to assume all risk." *Id.* The court held that the second-to-last clause rendered the entire release ambiguous because that clause created an inconsistency, which could lead a reasonable person to interpret the release as meaning that the signer did not assume liability in certain situations. *Id.* This impression was "sufficient to render the contract ambiguous." *Id.* This holding harmonizes with the way we have articulated the rule.

¶21 Similarly, in *Ghionis*, a skier was injured when she used ski boots that were incompatible with the skis she had rented from a ski resort. *Ghionis v. Deer Valley Resort Co.*, 839 F. Supp. 789, 791 (D. Utah 1993). The skier alleged that the resort gave her an express warranty of the skis' compatibility with her boots. *Id.* The resort asked the court to analyze whether the skier's release, which indicated that the resort rented all ski equipment to consumers in an "as is" condition,

protected the resort from liability. *Id.* at 793. The resort insisted that the release's "as is" language served as an express disclaimer of any warranties. *Id.* The court disagreed and held that because "the terms [were] slipped into paragraph 1, without any indication to the average consumer that they [were] words of art with distinct legal meaning," they constituted an ambiguous, and potentially deceptive, term. *Id.* at 793–94. This again comports with how we envision the rule should operate.

¶22 Taken together, these cases illustrate how a preinjury release must clearly and unmistakably inform a reasonable person who *and* what she is releasing to be enforceable. It is not enough that we might be able to squint at the preinjury release language and conclude that a reader "might have known" or "probably knew" that she was releasing a certain party or claim.

¶23 The Release Cunningham signed provided that he would "unconditionally and irrevocably release and discharge the Ogden Metro SWATT [sic] Team and all related organizations and entities from any and all claims, demands, damages, actions and causes of action arising, whether directly or indirectly, from or in connection with [his] attending or participating in the described SWAT training."

¶24 The Release's language does not clearly and unmistakably release "the Ogden Metro SWATT [sic] Team and all related organizations and entities" from liability for their own negligence.[5] Instead, it uses broad, general language that does not specifically nor unequivocally evince an intent to hold the released party blameless for its own negligent conduct. Unlike the release in *Freund*, there is no additional context that would put a party on specific notice that it was providing a preinjury release for claims arising out of the other party's negligence.

¶25 Ambiguity exists in a preinjury release when reasonable minds could disagree on the release's meaning. In the words of the *Union Pacific* court, had the Release meant to waive negligence claims against Weber County, "it would have been easy enough to use that

---

[5] Because we conclude that the release is not clear and unmistakable about what it purports to release, we need not address the question of whether it is clear and unmistakable about who it releases.

very language and to thus make that intent clear and unmistakable." *El Paso Natural Gas Co.*, 17 Utah 2d at 259–60.

¶26 Simply stated, the preinjury release Cunningham signed was not clear and unmistakable. It was therefore unenforceable, and the district court erred when it concluded otherwise and granted summary judgment.

## II. THE DISTRICT COURT ERRED WHEN IT CONCLUDED THAT THE GOVERNMENTAL IMMUNITY ACT OF UTAH DOES NOT WAIVE GOVERNMENTAL IMMUNITY FOR CLAIMS OF GROSS NEGLIGENCE

¶27 The Cunninghams asserted a claim of gross negligence. The district court granted summary judgment on that claim, reasoning that while the GIA waives immunity for injuries caused by a governmental entity's negligence, it does not waive immunity for injuries caused by the governmental entity's gross negligence. The Cunninghams argue that the district court misread the statute to reach that conclusion.

¶28 The GIA codifies the broad immunity that a sovereign traditionally enjoys from legal action and explicitly extends the immunity to political subdivisions, like counties. *See generally* UTAH CODE §§ 63G-7-101–904. The act provides that governmental entities "are immune from suit for any injury that results from the exercise of a governmental function," *id.* § 63G-7-201(1), unless the act specifically provides otherwise. *Id.* § 63G-7-301. In other words, a governmental entity enjoys immunity from suit unless the GIA waives that immunity.

¶29 The district court concluded that the Cunninghams "could not identify any provision within the [GIA] or any case law that supports their position" that the GIA waives immunity for gross negligence. The court further reasoned that had "the Legislature intended for government entities to be liable for their employees' gross negligence, the Legislature could have included such a provision, but did not do so."

¶30 We do not read the GIA the way the district court did. Before the district court, the Cunninghams argued that Utah Code section 63G-7-301(2)(i)—which waives governmental immunity for "any injury proximately caused by a negligent act or omission of an

employee committed within the scope of employment"—waives immunity for both simple and gross negligence.[6] We agree.

¶31 The GIA waives immunity for an injury "caused by a negligent act or omission." UTAH CODE § 63G-7-301(2)(i). "'[G]ross negligence' . . . differs from ordinary negligence only in degree, and not in kind." *Negligence*, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 34, at 212 (5th ed. 1984)). In other words, a grossly negligent act is still a negligent act. And when the Legislature waived immunity for negligent acts, it waived immunity for negligence in all of its forms. Accordingly, we reverse the district court's grant of summary judgment on Cunningham's gross negligence claim.

### III. THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT ON MS. CUNNINGHAM'S LOSS OF CONSORTIUM CLAIM

¶32 The district court granted Weber County's motion for summary judgment on Ms. Cunningham's loss of consortium claim. As with the gross negligence claim, the district court concluded that the GIA barred the loss of consortium cause of action "because there is no waiver of immunity for these types of claims." The district court declined "to extend the reach of the [GIA] to include waivers of immunity for claims not specifically identified in the [GIA]."[7]

¶33 The district court again misread the GIA. The GIA waives immunity for "*any* injury proximately caused by a negligent act or omission of an employee" committed within the scope of her employment. UTAH CODE § 63G-7-301(2)(i) (emphasis added). Ms. Cunningham alleges that Weber County's negligent act caused her to suffer a loss of consortium with her husband. That is an injury she claims was proximately caused by Weber County's negligence. The GIA waives immunity for the claim.

---

[6] The waiver of liability for negligent acts is subject to several exceptions given in Utah Code sections 63G-7-101(4) and 63G-7-201(2)–(4).

[7] The court also opined that even if the GIA had waived immunity for loss of consortium claims, "given [the] court's finding that Plaintiff Brian Cunningham's claims cannot be maintained, Plaintiff Mariah Cunningham's . . . loss of consortium claim is not viable and must be dismissed." The restoration of Brian Cunningham's claims undermines the district court's logic.

¶34 Even if we were tempted to entertain doubt about this reading, the statutory scheme governing loss of consortium claims would eliminate it. Utah Code section 30-2-11 sets forth the parameters of a loss of consortium claim. That section indicates that if damages are "awarded for loss of consortium which a governmental entity is required to pay" the total amount of damages "may not exceed the liability limit for one person . . . ." UTAH CODE § 30-2-11(8). This language confirms that the Legislature anticipated that a governmental entity might need to pay damages for a loss of consortium claim. There would have been no need for the Legislature to include such a provision if the Legislature did not understand that the GIA waived immunity for such claims in certain circumstances. Simply put, the district court misinterpreted the GIA to conclude that it does not waive immunity for loss of consortium claims related to injuries for which immunity is waived.[8]

## CONCLUSION

¶35 The district court erred when it concluded that the Release was clear and unmistakable. It was not, and it is therefore unenforceable. The district court also erred when it read the GIA to not waive the government's immunity for gross negligence and certain loss of consortium claims. We reverse the grant of summary judgment in favor of Weber County and remand.

---

[8] The County also argues that even if the GIA waives governmental immunity for Ms. Cunningham's claim, that claim should be dismissed because Cunningham "does not fit the definition of an injured person within the Code." Weber County contends that a loss of consortium claim requires a permanent injury and that "there is no evidence that [Cunningham's] injury is permanent." The district court disagreed saying that "the undisputed facts demonstrate that [Cunningham] suffered significant disfigurement as a result of the accident. Therefore, so long as he can maintain any of his causes of action against [the County], [Ms. Cunningham's] claim for loss of consortium is also viable." But the district court did not explicitly address whether the injuries were permanent. Weber County, in essence, asks us to affirm the district court on an alternate ground apparent from the record. The record before us does not permit us to do that, but nothing we say in this opinion should prevent the district court from revisiting the County's argument on remand.

JUSTICE HIMONAS, concurring:

¶36 The majority is spot-on: because the Release isn't clear and unmistakable, it's unenforceable. We could end our analysis there, as the majority proposes, *supra* ¶ 11 n.3, but I'd take the additional step of declaring the Release unenforceable for the independent reason that it covers activities in which there's a strong public interest, to wit, specialized law enforcement training. My unease with the majority's stopping point is that by only ruling on the ambiguity issue, we're suggesting that a differently worded release might pass muster in the future, despite it covering activities that obviously fall within the public interest. I'd clip that allusion now.

¶37 In Utah, preinjury releases are unenforceable if they (1) "offend public policy," (2) release "activities that fit within the public interest exception," or (3) are "unclear or ambiguous." *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 14, 179 P.3d 760 (citations omitted), *abrogated on other grounds by Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 28, 423 P.3d 1150. We distinguish "the public interest and public policy exceptions . . . in the context of preinjury releases," although some other jurisdictions don't make such a distinction. *Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶ 19, 445 P.3d 474 (referencing *Pearce*, 2008 UT 13, ¶ 14; *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 25, 301 P.3d 984).

¶38 We apply the six-factor *Tunkl* test when considering the public interest exception. *See Hawkins v. Peart*, 2001 UT 94, ¶¶ 9–10, 9 n.3, 37 P.3d 1062 (quoting *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 445–46 (Cal. 1963)), *superseded by statute on other grounds as recognized by Penunuri*, 2013 UT 22, ¶ 21 n.43. Those factors are

> [1] [The transaction] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power

the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Hawkins*, 2001 UT 94, ¶ 9 n.3.[9]

¶39  The *Tunkl* test "identifies the traits of an activity in which an exculpatory provision may be invalid." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 15, 171 P.3d 442, *abrogated on other grounds by Penunuri*, 2017 UT 54, ¶ 3. It's a flexible test and doesn't require all six factors be met; rather "the activity at issue need exhibit only a sufficient number of *Tunkl* characteristics such that one may be convinced of the activity's affinity to the public interest." *Id.* ¶ 16. Additionally, our court has "adopt[ed] the rule that preinjury releases for *recreational activities* are not invalid under the public interest exception." *Pearce*, 2008 UT 13, ¶ 21 (emphasis added).

¶40 The County gloms onto this recreational distinction and suggests that "[t]raining and education, while not exactly the same as recreational activities, are certainly more like recreation than operational functions like rescuing a hostage or stopping a gunman. In fact, to a law enforcement officer, training is much more comparable to a recreational or leisure activity than to anything else." Utter nonsense.

¶41 The public has a strong interest in specialized law enforcement training, including SWAT training. Without a competent and confident police force, we would be left without aid in dangerous and life-threatening situations. The *Tunkl* analysis strikingly illustrates the strong public interest in such law

---

[9] We initially considered the *Tunkl* test in *Hawkins*, adopted it in *Berry*, subsequently analyzed it in *Pearce*, and most recently discussed it in *Rutherford. See Tunkl*, 383 P.2d at 444–47; *Hawkins*, 2001 UT 94, ¶¶ 9–10; *Berry v. Greater Park City Co.*, 2007 UT 87, ¶¶ 15–16, 171 P.3d 442, *abrogated on other grounds by Penunuri*, 2017 UT 54, ¶ 3; *Pearce*, 2008 UT 13, ¶¶ 16–21; *Rutherford*, 2019 UT 27, ¶ 20.

enforcement training and why a preinjury release form in this setting is unacceptable. I take the factors in the order presented above.

¶42 *The transaction concerns a business of a type generally thought suitable for public regulation.* Specialized law enforcement training generally qualifies as a business suitable for public regulation. Indeed, given the critical role that law enforcement plays in our society, it strikes me as beyond obvious that such training is suitable for public regulation.

¶43 *The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.* Law enforcement officers are charged with performing at a high level in dangerous and uncertain situations, frequently in response to the public's need for protection or intervention. Thus, I agree with the Cunninghams' point that police training, including SWAT training, is a matter of great practical necessity for the public.

¶44 *The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.* Here, I focus on the latter part of the *Tunkl* language, which indicates that the party (i.e., the County) must have held itself out as willing to perform the service (i.e., SWAT training) for any member of the public *coming within certain established standards* (i.e., a member of a law enforcement agency that was signed up by their department for the training). While the County asserts that its SWAT training is "extremely selective," its "30(b)(6) representative testified that the Training is offered to anyone who receives permission from their [law enforcement] department and has their department sign them up." Thus, it seems that the County offered to perform the police SWAT training to anyone coming within certain established standards.

¶45 *As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.* In this instance, the County had an advantage in bargaining power over Cunningham with respect to the police SWAT training. Cunningham was required to complete the Weber County training to become a member of the Davis County SWAT team. And although the County points out that there are several other SWAT trainings to choose from in the state, Cunningham actually couldn't have opted to complete another training because of the limits Davis County placed on their SWAT team members.

¶46 *In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence*. The County required Cunningham, and all other SWAT training attendees, to sign a non-negotiable contract that "unconditionally and irrevocably release[d] and discharge[d] the Ogden Metro SWATT [sic] Team and all related organizations and entities from any and all claims, demands, damages, actions and causes of action arising, whether directly or indirectly, from or in connection with my attending or participating in the described SWAT training." The County didn't allow Cunningham or any other attendees to pay extra for protection against negligence. This inability of participants to purchase additional insurance or protection exemplifies the notion that the County was exercising a superior bargaining power.

¶47 *Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents*. The County controlled the Ogden City Metro SWAT training, which left Cunningham completely exposed to its negligence.

¶48 For these reasons, I'd hold that the Ogden City Metro SWAT training preinjury release form signed by Cunningham is unenforceable both because it's ambiguous and because it's contrary to the public interest.

———————